In re AIR CRASH DISASTER AT DE-
TROIT METROPOLITAN AIRPORT
ON AUGUST 16, 1987.

MDL No. 742.

United States District Court,
E.D. Michigan, S.D.

May 23, 1989.

See also, D.C., 130 F.R.D. 634.

Charles Brewer, Phoenix, Ariz., Stanley
Chesley, Cincinnati, Ohio, Lee Kreindler,
New York City, Gerald Lear, Thomas Mee-
han, Washington, D.C., Richard Schaden,
Birmingham, Mich., for plaintiffs' Steering
Committee.

Carroll E. Dubuc, Laxalt, Washington,
Perito and Dubuc, Washington, D.C., for
defendant, Northwest Airlines.

John J. Hennelly, Bryan, Cave, McPheet-
ers & McRoberts, Los Angeles, Cal., Don-
ald E. Shely, Dykema, Gossett, Spencer,
Goodnow & Trigg, Detroit, Mich., for de-
fendant, McDonnell Douglas.

ORDER

JULIAN ABELE COOK, Jr., Chief
Judge.

On April 14, 1989, the Defendant, North-
west Airlines, Inc. (Northwest), filed a
"Motion to Compel McDonnell Douglas
Corporation [MDC] to Answer Interrogato-
ries (Third Set) and Produce Documents."
In its motion, Northwest requests this
Court to compel MDC to (1) answer an
interrogatory which pertains to the "Jet
America Study," and (2) produce any doc-

uments that are identified in its answers. In addition, this Court has been asked by Northwest to require MDC to "describe and define the meaning of the phrase 'normal warranty procedures' that it included in two All Operating Letters ("AOL") on Texas Instruments 7274–55 series circuit breakers." MDC filed an opposition paper in this matter on May 1, 1989. For the following reasons, Northwest's request to compel under Rule 37(a)(2) is granted in part and denied in part.

## I.

On November 19, 1985, J.S. Schreiner, a Douglas Aircraft Company (DAC) field service representative, sent a memorandum to the Commercial Customer Service Department regarding a problem that Jet America had experienced with the Texas Instrument/Klixon 7274–55 circuit breaker which protects the fire extinguishing system on the MD–80 aircraft. According to the Schreiner memorandum, Jet America maintained that (1) the 7274–55 circuit breaker had failed and (2) this failure was not discovered until after the new cartridge squibs had been installed in its fire extinguishing system. Jet America asked DAC to review other circuit breakers that have no back up system or a fail annunciation so that, in the event of an unannunciated failure, "the airlines [may] more effectively purge their fleets of potentially defective [circuit breakers] of the type mentioned in the referenced AOL."

On March 6, 1986, David Blackmore approved a work order on this matter which was designed "to identify and analyze critical aircraft circuits that can be affected by a circuit breaker failure." Northwest asserts, and MDC does not contest, that the work order authorized the concentration of 240 hours of time by nine different engineering groups within DAC to study the issue.

On January 11, 1989, Northwest requested MDC to answer its third set of interrogatories and to produce certain designated documents. In particular, Interrogatory Number 2, which Northwest was authorized to serve pursuant to Rule 33(a) of the Federal Rules of Civil Procedure, provided:

Describe each and every action considered and/or taken by MDC in response to, as a result of and/or relating to Jet America's request ... for a study of circuit breaker failures in flight critical MD–80 systems, and identify each and every document relating to each such action.

MDC provided the following response:

MDC objects to this interrogatory for the reasons that the issues in this case do not involve any circuit breaker failures or alleged failures of any flight critical MD–80 systems. Without waiving its objections, MDC further states as follows: The only circuit breaker at issue in this case is the P–40 circuit breaker through which power is supplied to the MD–80 takeoff warning system of the Central Aural Warning System ("CAWS") unit.... While [Northwest] may contend that the takeoff warning system is a flight critical system, neither MDC's or other parties' witnesses ... have expressed an opinion that the takeoff warning system is flight critical.... [The Jet America] study did not result in a finding or conclusion that the takeoff warning system was a flight critical system or that the failure of the P–40 circuit breaker would have any significant effect [sic] on the aircraft or crew. No documents exist as a result of the study initiated at the request of Jet America reflecting that the takeoff warning system on the MD–80 is flight critical or that an open condition of the P–40 circuit breaker has an adverse effect on the safe operation of the aircraft.

Northwest, believing that MDC's response to its Interrogatory Number 2 was inadequate, now moves this Court to compel an answer and production from MDC pursuant to Rule 37(a)(2).

In opposition to the instant motion, MDC contends that the content of Interrogatory Number 2, which addresses a study of circuit breaker failures in flight critical MD–80 systems, is not relevant because the only circuit breaker at issue in this litiga-

tion is the P–40 circuit breaker, which is ostensibly not "flight critical."

Rule 33(b) of the Federal Rules of Civil Procedure in part provides that "[i]nterrogatories may relate to any matters which can be inquired into under Rule 26(b)." This Court has previously addressed this issue when it stated:

Rule 26(b) ... permits discovery "regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." Rule 26(b) states, in part, that:

[i]t is not ground for objection that the information sought will be inadmissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence. ... [D]iscoverable evidence (i.e., evidence that is "relevant to the subject matter involved") is evidence which is admissible or which is "reasonably calculated to lead to admissible evidence." The Court of Appeals for the Sixth Circuit has found that:

The scope of examination permitted under Rule 26(b) is broader than that permitted at trial. The test is whether the line of interrogation is reasonably calculated to lead to the discovery of admissible evidence.

*Mellon v. Cooper–Jarrett, Inc.*, 424 F.2d 499, 500–01 (6th Cir.1970).

*In re Air Crash Disaster at Detroit Metropolitan Airport on August 16, 1987,* MDL No. 742, at 2 (E.D.Mich. May 16, 1989).

Contrary to MDC's position on the issue, this Court concludes that providing answers as to what actions were considered or undertaken by MDC with regard to the Jet America study is "reasonably calculated to lead to the discovery of admissible evidence." One theory of causation focuses upon whether the takeoff warning system circuit breaker, which Northwest contends is in the same series as the circuit breaker that was discussed by Jet America, failed and, thus prevented the CAWS fail light from illuminating with a loss of power to this circuit breaker. Thus, it would appear that any action that was considered or

taken in response to a study relating to which systems might be compromised as a result of latent circuit breaker failure may lead to the discovery of admissible evidence regarding this theory of causation. Moreover, Blackmore stated in his deposition that the Flight Guidance and Control Group was specifically responsible for examining the takeoff warning system circuit breakers. Certainly any actions taken or contemplated by this group would be relevant to Northwest's theory of causation as articulated above. Therefore, MDC's contention that Interrogatory Number 2 is not relevant discovery, as defined within Rule 26(b), must be rejected, and every action taken or considered concerning the Jet America study must be disclosed to Northwest within a period of fourteen (14) days from this date.

MDC also avers that "there is nothing to compel with respect to this interrogatory ... [since] the study coordinated by Mr. Blackmore was what resulted from the Jet inquiry." If (1) the only action taken or considered was the study coordinated by Blackmore and (2) this study has been previously produced, then MDC need produce no further answer to this interrogatory. However, if the Blackmore study is not the sole action taken or considered by MDC, then the additional actions and contemplations must be disclosed. In addition, MDC must identify each document relating to such actions.

## II.

During his deposition in the present case, Blackmore testified that the Jet America study was terminated subsequent to the crash of Flight 255. (Blackmore Dep. at 74–76). However, he also indicated that, sometime thereafter, the counsel for MDC instructed DAC to reopen the Jet American study. (Blackmore Dep. at 89–93). Thus, MDC maintains that any information which was derived from the study upon the insistance of counsel, constitutes work product and is outside the scope of Northwest's discovery request under Rule 33.

For purposes of discovery, the standards and procedures for supporting a claim of

work product are provided in Rule 26(b)(3) and (4) of the Federal Rules of Civil Procedure. With regard to the instant motion, the claim of work product is governed by Rule 26(b)(3). In *Toledo Edison v. G.A. Technologies, Inc.,* 847 F.2d 335 (6th Cir. 1988), the Sixth Circuit Court of Appeals outlined the "sequential steps" that a court must follow when considering a claim of work product under Rule 26(b)(3):

1. The party requesting discovery must first show that, as defined in Rule 26(b)(1), the materials requested are "relevant to the subject matter involved in the pending litigation" and are not privileged. Because the application of subdivision (b)(3) is limited to "documents and tangible things otherwise discoverable under subdivision (b)(1)," the burden of making this showing rests on the party requesting the information....

2. If the party requesting discovery meets this burden and the court finds that the claimed material is relevant and not privileged, the burden shifts to the objecting party to show that the material was "prepared in anticipation of litigation or for trial" by or for that party or that party's representative, including that party's attorney,.... This showing can be made in any of the traditional ways in which proof is produced in pretrial proceedings such as affidavits made on personal knowledge, depositions, or answers to interrogatories....

3. If the objecting party meets its burden as indicated above ..., the burden shifts back to the requesting party to show that the requesting party (a) has substantial need of the materials in preparation of the party's case, and (b) that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.

*Id.* at 339–40.

■ Applying the *Toledo Edison* "sequential step" analysis to the merits of the case at bar, Northwest has shown the requested information to be relevant and nonprivileged within the meaning of Rule 26. As a result, the first step has been accomplished and the burden now shifts to MDC to establish that the material was "prepared in anticipation of litigation or for trial."

In support of its claim of work product, MDC attached an affidavit to its opposition papers, which provides in part: "The post-accident study referred to in Mr. Blackmore's deposition was an analysis requested by counsel for MDC after this litigation had already commenced to assist counsel in preparation for trial. The cost of this analysis was paid for by counsel and treated as a litigation expense." (Dombek Aff'd, Para. 6).

In the *Toledo Edison* case, the Sixth Circuit Court of Appeals reversed the lower court's refusal to acknowledge that the affidavit testimony of the objecting party, which indicated that the documents in question were prepared, obtained, or received in anticipation of litigation, was sufficient to establish the existence of a work product. The *Toledo Edison* Court stated:

In explanation, the [lower] court also held that the statements in the affidavit were not sufficient to "provide the precise information necessary to make an informed decision on plaintiff's claim that the documents contained work product." This is in error. The undisputed affidavit of [the president of the objecting party corporation] is specific and detailed to indicate that the documents were prepared in anticipation of litigation or for trial. This is the only burden the plaintiff-objector has. *It is not required in making prima facie case that the authors of the documents, their positions, or their responsibilities in connection with the litigation be spelled out, nor is it required in the ordinary case that the dates of preparation of the documents be stated, nor does the objector have the burden of affirmatively showing to whom the documents were disclosed in order to make a prima facie case.*

*Id.* at 337 (emphasis added).

The affidavit testimony of the counsel for MDC, which indicates that the post-accident circuit breaker study was prepared in anticipation of litigation, satisfies the ob-

jecting party's burden at the second sequential step of the *Toledo Edison* test. Once the objecting party has met its burden, the burden returns to the requesting party to establish that it (1) has a substantial need for the materials, and (2) is unable to obtain such information without undue hardship. Northwest has failed to address this third sequential step in the work product analysis. Hence, this Court must conclude that the post-accident study is a protected work product and not discoverable under Rule 26(b)(3).

### III.

■ In an All Operators Letter (AOL) dated November 22, 1989, MDC discussed reported problems with the circuit breaker on the DC–10 and Super 80 aircraft that were manufactured between January 1979 and November 1980. MDC noted that "the rejection rate for Klixon circuit breakers is approximately one half of one (1) percent, which constitutes an acceptable quality level of rejections and parallels that of circuit breakers manufactured by Wood and Mechanical Products." MDC further indicated that it tested a random sample of 315 circuit breakers from existing stock that had the same date codes as the complained of circuit breakers. The results, according to MDC, indicated that none of the 315 circuit breakers tested failed. The final paragraph of this AOL stated:

Inasmuch as the results of the aforementioned investigation indicate that the failure rate of these particular circuit breakers are at an acceptable quality level, Douglas suggests that normal warranty procedures be adhered to when encountering a failed circuit breaker.

On January 14, 1989, MDC reiterated the contents of this letter in a second AOL which addressed the issue of circuit breaker failure.

In Interrogatory Number 3 to MDC, dated January 11, 1989, Northwest inquired into the meaning of "normal warranty procedures" when it asked:

Describe in detail the "normal warranty procedures" that the aircraft operators were directed to follow with respect to Texas Instruments/Klixon 7274–55 circuit breakers, as referred to in the November 22, 1982 AOL 9–1281B and the January 14, 1983 AOL–9–1281B, Deposition Exhibit 95.

In response to Interrogatory Number 3, MDC represented:

MDC objects to this interrogatory on the grounds that it seeks information and documents neither relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence. . . .

Without supporting documentation, Northwest asserts that MDC conducted tests on the Klixon 7274–55 circuit breakers and found them to be faulty. According to Northwest, MDC's failure to modify its November 22, 1982 AOL evinces that it

was knowingly misleading its operators/customers that the circuit breakers met acceptable quality standards and that if an operator experienced a faulty breaker, it was to follow "normal warranty procedures." Republic relied on these AOLs in not purging its aircraft of the date coded circuit breakers.

. . . The P–40 circuit breaker on the Accident aircraft that failed to conduct power to the takeoff warning system on the Accident takeoff was of this series and within that date code. Therefore, it is highly relevant and pertinent that MDC describe DAC's meaning of the phrase "normal warranty procedure".

On the basis of the record, this Court concludes that Northwest has failed to establish that a description of the term "normal warranty procedure" is "reasonably calculated" to lead to the discovery of admissible evidence. While it is clear that evidence of an excessive failure rate of the Klixon 7274–55 circuit breaker may be admissible or lead to the discovery of admissible evidence, knowledge of the normal warranty procedure in the event of circuit breaker failure is not likely to lead to the discovery of such evidence. Therefore, Northwest having failed to articulate how the description of the "normal warranty procedure" would be likely to lead to admissible evidence, Northwest's motion to

compel an answer to Interrogatory Number 3 is denied.

### IV.

Lastly, Northwest seeks to persuade this Court to compel MDC to produce the unspecified documents that were requested in its "Request for Production of Documents Number 1," which sought the production of:

> All documents relied upon, reviewed, consulted, or referred to by MDC, and not previously produced by MDC, in responding to Northwest's Third Set of Interrogatories and Related Document Request to Defendant [MDC] ..., and all documents identified in MDC's response to Northwest's Third Set of Interrogatories, not previously produced by MDC.

MDC responded to the request to produce documents as follows:

> In responding to [Northwest's] Third Set of Interrogatories and Related Document Production Requests, MDC did not rely upon, review, consult or refer to any document not previously produced to [Northwest]. In addition, MDC has not identified any document in response to [Northwest's] Third Set of Interrogatories not previously produced to [Northwest].

■ The request by Northwest to produce focuses exclusively on the alleged paucity of documents that have been received from MDC regarding the Jet America study. Northwest contends that MDC's response to its request to produce, which resulted in the production of approximately 10 pages of documents pertaining to the Jet America study, is insufficient since approximately 240 work hours on the Jet America study were authorized by Blackmore's work order. Thus, Northwest moves the Court to order MDC to produce the requested documents or, "if MDC continues to maintain that no other documents exist with respect to the Study, this is so inherently incredible that MDC should be required to describe in detail the search it has made of the files of each of the Systems Groups and engineers who participated in this study."

In response to Northwest's Request for Production Number 1, MDC stated that it "did not rely upon, review, consult, or refer to any document not previously produced to [Northwest] ... [and] has not identified any document in response to [Northwest's] Third Set of Interrogatories not previously produced to [Northwest]." In its opposition papers, MDC reiterates that it possesses no documents pertaining to the request to produce documents at issue.

It is well established that in those situations in which the documents sought to be produced are not in existence, a request to produce must be denied. *Zervos v. S.S. Sam Houston,* 79 F.R.D. 593, 595 (S.D.N.Y.1978); *Securities Exchange Comm'n v. Canadian Javelin Ltd.,* 64 F.R.D. 648, 651 (S.D.N.Y.1974); *LaChemise Lacoste v. Alligator Company, Inc.,* 60 F.R.D. 164, 172 (D.Del.1973) (court refused to compel production where party averred that it had produced all documents in its possession); *Pope v. Ungerer & Co.,* 49 F.R.D. 300, 303 (N.D.Ga.1969).

Therefore, given MDC's representation that it has produced all of the documents which pertain to the Request for Production Number 1, this Court will deny Northwest's motion to compel production of documents without prejudice. However, this Order does not (1) absolve MDC from producing all of the documents that were relied upon, reviewed, consulted, or referred to by MDC in its attempt to ascertain those actions that were taken or considered by it in response to the Jet America Study, or (2) preclude Northwest from revisiting this issue in a timely fashion if it obtains reliable and competent information that MDC's representations regarding the documents are misleading or substantively inaccurate.

IT IS SO ORDERED.