**ENRON OIL & GAS COMPANY, Relator,**

v.

**Honorable Manuel R. FLORES, Respondent.**

No. 04–91–00016–CV.

Court of Appeals of Texas, San Antonio.

March 20, 1991.

Jack O'Neill, John E. O'Neill, Michael D. Kirby, Warren W. Harris, Porter & Clements, Houston, Oscar J. Pena, Sr., Laredo, for relator.

Lawrence A. Mann, Mann & Jones, John E. Mann, Mann, Trevino, Hale & Gallego, Laredo, Kevin F. Risley, Butler & Binion, Harrell Feldt, Vinson & Elkins, Dwight A. Dalrymple, Tejas Gas Corp., William J. Mays, Akin, Gump, Strauss, Hauer & Feld, Houston, M.C. Whitehead, Long & Whitehead, Karnes City, Eileen Kisluk, Gary W. Orloff, Enron Corp., Houston, Patton G. Lochridge, John R. Breihan, McGinnis, Lochridge & Kilgore, Austin, Arturo A. Figueroa, County Atty., Zapata, for respondent.

Before REEVES, BUTTS and BIERY, JJ.

## ON RELATOR'S APPLICATION FOR WRIT OF MANDAMUS

PER CURIAM.

This is an original proceeding. Relator, Enron Oil & Gas Company (EOG) filed this petition for writ of mandamus seeking to have this court direct Respondent, Honorable Manuel R. Flores, to withdraw a Substituted Order of December 6, 1990, compelling discovery in cause number 2418 in the 49th District Court of Zapata County.

EOG and the real parties in interest (the Garcias) are parties to an oil and gas lease. The Garcias filed a suit against EOG and other defendants, in which the Garcias allege: (1) that EOG owed the Garcias a duty of good faith and fair dealing and has breached that duty; (2) that EOG should be calculating the Garcias' royalty based upon the then best obtainable price rather than upon the then current market value at the well of the gas; (3) that EOG has committed constructive fraud against the interests of the Garcias; (4) that EOG breached its duty to reasonably market the Garcia gas by failing to seek the highest possible price therefor; (5) that EOG's actions have been tortious, justifying punitive damages; and (6) that the Garcias have not been paid market value for their gas. The Garcias contend EOG sells gas to affiliated companies, buys it back at a slightly higher price, and then sells it to Cogenron, a cogeneration facility, at a much higher price.[1]

The discovery order requires EOG to produce documents, such as marketing agreements related to the Garcia gas; cogeneration documents; internal annual gas reserve reports, except reports which relate to fields or wells EOG stipulates were never used to perform gas supply or purchase contracts which EOG has with cogeneration facilities in which it has an interest; and other materials concerning volumetric and pricing information.

EOG must show that Judge Flores abused his discretion in issuing the discovery order. *Loftin v. Martin,* 776 S.W.2d 145 (Tex.1989). EOG contends Judge Flores abused his discretion because (1) the discovery order is utterly irrelevant in light of *Exxon Corp. v. Middleton's,* 613 S.W.2d 240 (Tex.1981), mandate regarding comparable sales; and (2) Judge Flores failed to follow the dictates of *Automatic Drilling Machines v. Miller,* 515 S.W.2d 256 (Tex.1974), before ordering the production of trade secret/proprietary information. *See* TEX.R.CIV.EVID. 507.

■ Under the first ground for relief EOG argues that the lease provides for market value royalties rather than proceeds royalties and that under *Exxon Corp. v. Middleton,* market value at the well is the price the gas would bring when it is offered for sale by one who desires, but is not obligated to sell, and is bought by one who is under no necessity of buying it. According to EOG, market value of gas is based upon comparable sales. EOG concludes that the information sought by the Garcias, and ordered produced by the trial court, does not relate to market value as defined in *Middleton.* As set out above, however, the allegation that the Garcias have not been paid royalties based upon market value is only one of several causes of action pled by the Garcias. We will not address the merits of the Garcias' suit. *See* footnote 1.

■ EOG also argues that the discovery order is overbroad and burdensome because it requires EOG to review document files of more than 1900 wells in the United States and elsewhere and the cogeneration information ordered discovered beyond pricing information could not be calculated to lead to the production of relevant information. However, according to EOG's reservoir engineer expert, George Sears, who testified at the discovery hearing, reserve data would aid in determining the extent to which EOG had sufficient reserves available to supply the cogeneration contract without the use of gas from the Garcia wells.[2] We cannot say the trial court clearly abused its discretion under EOG's first ground for relief in determining that the material sought was discoverable, based upon the causes of action the Garcias alleged.

Turning to the second ground, EOG contends Judge Flores abused his discretion in ordering discovery of sensitive documents without first conducting an in camera in-

---

1. EOG and the Garcias effectively attempt to have this court pass upon the merits of the underlying suit and the legal validity of the Garcias' causes of action and theories of recovery. We do not address the merits in this man- damus proceeding, and this opinion is not to be taken as approval or disapproval of the merits.

2. See the portions of the testimony set out in the Appendix.

spection of the documents. EOG relies upon *Automatic Drilling Machines v. Miller*, 515 S.W.2d 256 (Tex.1974). An examination of that case and others in the area of in camera inspections is necessary.

In *Automatic Drilling Machines*, a competitor sued Automatic Drilling Machines. The plaintiff was taking an oral deposition of an automatic drilling rigs expert who had done design and development work for the defendant. Shortly after the deposition began, the defendant's attorney instructed the witness not to answer questions about confidential matters on which he was working for the defendant. The attorney also stated that trade secrets had been removed from the file produced in response to a subpoena duces tecum. The deposition was halted, and the parties presented the matter to a judge. The judge announced that he had only fifteen minutes to hear the motions to compel and for a protective order. The defendant requested the court to examine the documents in camera. The court did not do so, and the judge ordered the production of the material. The Texas Supreme Court stated that trade secrets are not necessarily privileged. "If the information is material and necessary to the litigation and unavailable from any other source, a witness may be required to make disclosure." *Id.* at 259. It is necessary for a judge to weigh the need for discovery against the desirability of preserving the secrecy of the material in question. *Id.* The court held, "With the record in its present condition, it was an abuse of discretion for the trial court to overrule relator's motion and order full disclosure of all the material." *Id.* at 260. The court observed that the trial judge had two avenues available. He could have examined the material with the aid of an expert to determine what, if anything, was relevant and essential to the plaintiff's investigation and development of their case. The judge also could have deferred action on the motions until the deposition of the witness was completed. The court noted that the information sought by the plaintiff could conceivably be obtained by eliciting from the witness a description of the secret processes and devices in terms sufficiently general to

protect the defendant while enabling the plaintiff to make further investigation concerning any use to which the new systems and procedures may have been put. *Id.* However, the judge should not have ordered full disclosure without first making further inquiry to determine relevance of and need for the information. *Id.*

In *Weisel v. Curry*, 718 S.W.2d 56 (Tex. 1986), the trial court withheld documents from discovery as privileged. Although the party seeking discovery asked for an in camera inspection by the court, the judge did not do so. The party resisting discovery presented a list of documents, stating that they were privileged as attorney-client communications or as work product. The Texas Supreme Court held that since there was no evidence supporting the claims of privilege, the trial court abused its discretion in denying discovery. *Id.* at 58. The Supreme Court stated

> Under certain circumstances, such as when relevancy or harassment is the basis for protection, affidavits or live testimony may be sufficient proof. When, however, the claim for protection is based on a specific privilege, such as attorney-client or attorney work product, the documents themselves may constitute the only evidence substantiating the claim of privilege.

*Id.* The court concluded that there was no evidence of privilege, only an unverified global assertion of privilege, stating:

> Under the facts of this case, the trial court had no choice but to review the allegedly privileged documents in camera, prior to its ruling, because it was asked to make an in camera review, and there was no evidence other than the documents themselves which substantiated [plaintiff's] claim of privilege.

*Id.*

In *Loftin v. Martin*, 776 S.W.2d 145 (Tex.1989), the trial court denied discovery sought by the plaintiff about statements and communications made during the investigation of a workers' compensation matter. The insurance company asserted an investigative privilege. There was, however, no evidence to show that the request-

ed documents were prepared in anticipation of litigation. The Supreme Court held that under the facts of the case, where there was no evidence of privilege nor an in camera review, the trial court abused its discretion in denying discovery. *Id.* at 148. The court relied upon *Weisel* stating that in that case the Supreme Court held that a trial judge abuses his discretion when he denies discovery in the absence of evidence substantiating the claim of privilege.

Recently, in *State v. Lowry*, 802 S.W.2d 669 (1991), the Supreme Court held that the trial court abused its discretion in ordering discovery of Attorney General documents without undertaking an in camera review. The State asserted the informant privilege under TEX.R.CIV.EVID. 508(a). The Supreme Court once again relied upon *Weisel* for the following proposition:

> [A] party should provide evidence to the trial court in the form of affidavits or testimony to establish the claimed privilege; albeit in some limited circumstances the documents themselves may, standing alone, constitute sufficient proof.

*Id.* at 671. The Supreme Court went on to hold:

> The State, however, offered no affidavits or testimony to set forth the factual basis of these claims [of privilege]. To establish the informant privilege, the State must initially show that the person has provided to a law enforcement officer information assisting in the investigation of a possible violation of the law. The content and addressee of the letter may be sufficient to prove the necessary factual predicate. Thus, the letters themselves may establish the privilege claimed. Because the Attorney General offered to tender these documents for an *in camera* inspection, and such review was critical to the evaluation of privilege, the trial judge should have conducted an examination.

*State v. Lowry* at 673 (citations omitted).

In *Barnes v. Whittington*, 751 S.W.2d 493 (Tex.1988), the Supreme Court was faced with a different type of discovery situation, but the court's approach is in-structive on the issue of when a trial court must conduct an in camera inspection. The trial court inspected the documents at issue in camera. Ultimately, the trial court ruled that the documents were privileged under TEX.REV.CIV.STAT.ANN. 4447d, § 3. In the original proceeding in the Supreme Court, the party seeking discovery contended the documents were not privileged. The Supreme Court observed that included among the documents presented to the trial judge for in camera inspection were two affidavits. The Supreme Court held that the affidavits were not properly filed and served on opposing counsel. The court determined that even if the affidavits were properly before the trial judge, the affidavits contained merely global allegations that the documents come within the privilege and were no evidence of the privilege. The court stated, "In the absence of any additional evidence to support the claimed privilege, this court must review the documents themselves to determine if they clearly support the privilege as a matter of law." *Id.* at 495. The court undertook steps similar to those a trial court is faced with in determining a claim of privilege. The court looked for evidence on the issue of privilege. Finding none, the court was required to review the documents themselves.

In *National Union Fire Insurance v. Hoffman*, 746 S.W.2d 305 (Tex.App.—Dallas 1988) (original proceeding), the court observed the following:

> Once a party claims that a document is privileged from discovery, *Peeples [v. Fourth Court of Appeals*, 701 S.W.2d 635 (Tex.1985)] places the burden upon the claimant to produce evidence to establish the privilege. *Peeples*, 701 S.W.2d at 637. That evidence need not invariably include the document itself. Were it otherwise, the trial court would be required to make an *in camera* inspection in every case. A party may meet its burden with conclusive evidence apart from the document itself. By the same token, a party may fail to meet its burden if the evidence offered in support of the privilege is so insufficient that

recourse to the document itself is unnecessary.

*Id.* at 310.

■ Rule 166b(4) of the Texas Rules of Civil Procedure provides for steps to be taken "[i]f the trial court determines that an in camera inspection and review by the court of some or all of the requested discovery is necessary." We agree that an in camera review is not automatically necessary whenever a privilege is claimed.

■ The question is whether the trial court's action in allowing discovery without undertaking an in camera inspection was so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *Loftin v. Martin,* 776 S.W.2d at 146. A mere error of judgment is not an abuse of discretion. *Id.* Mandamus will not issue unless a clear abuse of discretion is shown. *Jampole v. Touchy,* 673 S.W.2d 569, 572 (Tex. 1984).

For this court to conclude Judge Flores abused his discretion, we must find that the facts and the law permitted him to make but one decision, that an in camera inspection was necessary. *See Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 917 (Tex.1985). We will not issue the writ of mandamus if there is some basis in reason and law for the order of the trial court. *Id.*

■ From the cases we have discussed concerning in camera inspections in discovery proceedings, we glean the following: A trial court does not abuse its discretion by failing to review documents in camera if there is sufficient evidence about the privileged nature of the documents upon which the trial court could reasonably base its order, such that resort to the documents themselves is unnecessary. If the trial court could have reasonably determined that the documents themselves would not have assisted him in making his decision, there can be no clear abuse of discretion.

In the case at hand, unlike those discussed above, evidence was presented to Judge Flores about the sensitive and secretive nature of reserve reports. This was done through the testimony of George Sears. Because our decision about whether Judge Flores abused his discretion depends in large part on the evidence he had before him, we set out the relevant parts of that testimony in detail in the Appendix to this opinion.

■ In the present case, according to *Automatic Drilling Machines,* it was incumbent upon Judge Flores to weigh the need for discovery against the desirability of preserving the secrecy of the material in question. From Sears' testimony, set out in the Appendix, it is apparent that the judge had evidence with which he could weigh the conflicting needs of the parties. The fact that Judge Flores entered a protective order indicates that he found that the reserve reports were trade secrets.[3] The testimony of George Sears provided the judge with sufficient evidence upon which to base his order. The testimony went beyond mere global assertions of privilege and was the type of expert assistance envisioned in *Automatic Drilling Machines.* The trial court could have reasonably determined that the documents themselves would not have assisted him in making his decision. We cannot conclude Judge Flores clearly abused his discretion in issuing the discovery order, without reviewing the documents in camera, where he heard evidence of the privilege.

The application for writ of mandamus is denied.

---

**3.** The substituted order of discovery protects EOG to the extent that the Garcias' attorneys may not make the reserve reports available to the Garcias without obtaining permission of the trial court in advance. Additionally, the Garcias' attorneys may make such information available to consulting or testifying experts if a list of the experts who view the information is maintained, EOG is advised of the identity of all testifying or consulting experts who will be shown such information at least three days before their first inspection of the documents, each person who views the documents signs an agreement to be bound by the protective order, and the list and documents are turned over to EOG at the conclusion of the lawsuit.

**414**

George Sears testified in part as follows [4]:

Q: Now, I would like for you to explain to the Court what a reservoir study is?

A: Okay. A reservoir study, basically, is a combination of geologic and engineering information which purports to calculate the exerial extent and the volumes of natural gas reserves which underlie particular properties, and they are very detailed studies and calculations that require various imputs, like I say, geologist, petroleum engineers, sometimes chemical engineers and a summary is made of the distribution in volumes of gas.

Q: If I can just draw briefly. If we make this (indicating) the surface of the earth, and this is an oil well bore. The bore goes into in to a reservoir, doesn't it?

A: Yes, that's correct.

Q: Do people know what that reservoir is, other then people specializing in this industry?

A: No.

Q: If I walked by would I know what and oil and gas reservoir underlay the land?

A: No.

\* \* \* \* \* \*

Q: All right. Now, if you are the landowner, does the reservoir information about reservoirs underlying your property, is it important to you that it be kept confidential as well as the oil company?

A: Yes, it's very important.

Q: Is that so other landowners won't be able to sit and tap into reservoirs underneath your property?

A: Yes, that's correct.

Q: And is that understood as a matter of custom and usage throughout the oil and gas industry?

A: Yes.

Q: Is there any more sensitive or secret information in the oil and gas industry than the reservoir studies underlying reservoirs?

A: No, that's about the more secret.

\* \* \* \* \* \*

Q: If that sort of information fell, in any way, into the hands of competitors, can you describe what they could do?

A: They would certainly have an advantage at being able to develope property at a very cheap rate.

Q: They could buy the land surrounding landowners land, for example, and tap into the reservoir.

A: That's correct.

Q: Do you understand that the Garcias themselves are in the oil and gas business now?

A: I'm not personally aware of that. I have heard that.

On cross-examination, Sears further testified:

Q: Mr. Sears, let's talk about a couple of things. First, let's talk about these reserve studies. Now, one thing that you didn't mention is that the reserve studies have a good bit of conversation about price, don't they.

A: That's correct.

Q: In fact, in the reserve studies, it will say at what price Enron expects to get for its gas.

A: That's correct.

Q: All right. And certain reserve studies are prepared under Securities and Exchange Commission guidelines, aren't they?

A: Yes.

Q: And as I understand it, those type of reserve studies the petroleum engineers are required to use a current price and not escalate it, unless the gas is dedicated to a particular contract; isn't that right?

A: Yes.

Q: All right. So that in connection with say, the Garcias property and the gas that came from the Garcias', Enron, in its reserve studies, prepared pursuant to

**4.** We quote from the statement of facts verbatim with no editorial corrections, except for expla-  nations where necessary.

SEC guidelines, would have to use a current price and not escalate it, unless that gas were being used or were dedicated to some gas sales contract, wouldn't they?

A: Yes.

Q: And you've reviewed, in particular, Exhibit 1–J, which is the reserve report for 1987, where, in fact, it shows that some of the gas from the Garcias' lease, itself, is being attributed the higher prices that Enron gets from some downstream contracts, isn't it.

A: That's right.

Q: So, Enron is telling the SEC in fact, that they are getting several dollars higher mcf for the gas that is actually being produces from the Garcia property, aren't they?

A: I'm not sure if the distribution of this particular—SEC standard formats are sometimes used internally within companies and not necessarily submitted.

Q: To whomever this reserve study is shown, such as investors and so forth, they are being told that this Garcia gas is bringing a dollar or two higher then whatever you say the market value is in the field?

A: I believe, to clear the record up, that they were directed to do so.

Q: All right. They were directed to do so by Enron?

A: Yes, sir.

Q: So, Enron itself directed its own petroleum engineer to use a higher price than what you say is market value for the gas in the Garcias' land, isn't that right?

A: That's correct.

    *    *    *    *    *    *

Q: [To determine market value] you would also want to know what gas was being used to fulfill [the cogeneration] contract, wouldn't you?

A: I'm not sure you could ever determine that.

Q: In order to determine that, you would have to find out what other gas reserves Enron Oil and Gas has that could satisfy that contract, wouldn't you?

A: Yes, that's true, because there's a real mixture of gas going into that plant.

Q: All right. So, you would want to know then whether or not the Roletta Field is satisfying that contract, correct?

A: Okay.

Q: And you would want to know whether or not their gas field in Matagorda County is satisfying that contract, wouldn't you.

A: Okay.

Q: And one way to find that out is to look at their reserve studies to see what prices they are attributing to that gas, wouldn't you?

A: Well, again, I'm not sure that this is the final dedication document itself, this is an indication of an internal valuation of reserves based on someone's, you know, asking that certain dollars be placed on this, but I'm not sure of the legal underlying basis for this as a dedication document.

Q: Okay. But, that someone are the Enron personnel themselves, right?

A: Yes.

Q: They are telling their consultant, use the Garcia gas to satisfy this contract and use that contract price, right.

A: If that's what they are saying, yes.

Q: But, you would also want to know, because the Garcia gas may not be able to satisfy all of that or maybe it gets comingle in the stream, what other reservoirs are satisfying that contract, wouldn't you?

A: Yes.

Q: And one way to find that out is to find out from Enron itself, correct?

A: That's one way, yes.

Q: And one way to find out is to find out what Enron is telling their own reserve engineer what other fields could be used to satisfy that contract, right.

A: All right.

Q: And you find that in the reserve studies, related, not to the Roletta field, but to other fields in Texas, wouldn't you?

A: In Texas, yes.

Q: In Texas. Okay. Now, so just having the reserve study as to the Garcia lease itself doesn't give you the whole picture, does it?

A: Well, as I said earlier, it gives me a complete picture in that the sale at the wellhead—There's a market value at wellhead price, it's a final price and the downstream sales are totally irrelevant, in my opinion.

Q: Well, we have already found out that were not for this scheme here, (indicating) in all likelihood these people would be paying a higher price at the wellhead, wouldn't they?

A: That gets out of my area of expertise.

Q: All right. And that's something you'd want to find out if you were doing a market value study, wouldn't you?

A: Not necessarily, because I'm concentrating on the wellhead and I want to know what the market value at the wellhead is.

Q: But, doesn't a price that someone else might be willing to pay at that wellhead have an impact on what that market value is at the wellhead?

A: Well, not in terms of satisfying the contract between the producer and the landowner, no.

Q: Well, isn't every gas purchased in the field important to you?

A: Well, in a weighted average form, yes.

Q: And if someone was out there saying, I'm willing to pay three dollars at the Roletta field for gas, wouldn't that be important to you?

A: In a weighted average sense, yes.

Q: Well, in any sense, in order to determine market value, wouldn't it?

A: Yes.