# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
November 9, 2000 Session

## DUDLEY G. BOYD, ET AL. v. COMDATA NETWORK, INC., ET AL.

### Appeal from the Chancery Court for Williamson County
### No. 26397      Russ Heldman, Judge

---

### No. M2000-00949-COA-R9-CV - Filed April 30, 2002

---

This appeal involves a discovery dispute implicating the common interest privilege and the work product doctrine. After filing suit in the Chancery Court for Williamson County to rescind their guaranties, the individual guarantors of a corporate debt served interrogatories and requests for production of documents on the creditor seeking copies of all written communications between the creditor and the corporation from which the creditor had purchased the corporate debt. The creditor objected to the production of documents involving its negotiation of a joint defense agreement with the original creditor and the drafts of an agreement to repurchase the corporate debt. The trial court directed the creditor to produce both categories of documents but permitted the creditor to pursue an interlocutory appeal. We granted the interlocutory appeal to address the application of the common interest privilege and the work product doctrine. We have determined that the common interest privilege shields the documents relating to the joint defense agreement from discovery and that the work product doctrine likewise protects the drafts of the repurchase agreement. Accordingly, we reverse the trial court's order compelling the production of these documents.

### Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Chancery Court Reversed

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which WILLIAM B. CAIN and PATRICIA J. COTTRELL, JJ., joined.

William R. O'Bryan, Jr., Kenneth M. Bryant, and E. Todd Presnell, Nashville, Tennessee, for the appellant, Comdata Network, Inc.

Scott Justin Crosby and Susan M. Clark, Memphis, Tennessee, and George H. Nolan and Julie C. Murphy, Nashville, Tennessee, for the appellees, Dudley G. Boyd and Jan E Boyd.

### OPINION

### I.

The Fidelity Group, Inc. ("Fidelity Group") is a Tennessee corporation engaged in the business of receivable financing for small transportation companies. Its president and majority stockholder is Dudley G. Boyd who lives in Memphis, Tennessee. In connection with its business,

Fidelity Group obtained an unsecured line of credit from NTS, Inc. ("NTS"), a Delaware corporation located in Fort Worth, Texas. NTS provides financial and related services to trucking companies, truck stops, and other members of the transportation industry.

By September 1997, Fidelity Group had drawn down $834,750.66 on its NTS line of credit and was unable to repay it. Mr. Boyd, Fidelity Group, and another Tennessee corporation Mr. Boyd controlled entered into three agreements with NTS on January 15, 1998, to restructure Fidelity Group's debt. First, NTS and Sovryn, Inc. ("Sovryn")[1] entered into a Marketing Services Agreement, anticipating that Sovryn's commissions would be used to pay down Fidelity Group's debt to NTS. Second, both Fidelity Group and Sovryn executed a Promissory Note and Debt Reduction Agreement in which they agreed to be jointly and severally liable for Fidelity Group's debt and to repay the debt in scheduled installments by 2001. Third, Mr. Boyd and the Boyd Revocable Inter-Vivos Trust ("Boyd Trust")[2] executed a Guaranty Agreement guarantying the payment of the Promissory Note and Debt Reduction Agreement executed by Fidelity Group and Sovryn.

During the negotiations over the restructuring of Fidelity Group's debt, NTS disclosed to Mr. Boyd that it was negotiating the sale of substantially all of its assets to Comdata Network, Inc. ("Comdata"), including the Marketing Services Agreement, the Promissory Note and Debt Reduction Agreement, and the Guaranty Agreement. Following consultations with Comdata, Mr. Boyd, on behalf of himself and his corporations, assented to this transaction. On January 17, 1998, NTS entered into an Exchange Agreement with Comdata conveying to Comdata all its right, title, and interest in the Marketing Services Agreement, the Promissory Note and Debt Reduction Agreement, and the Guaranty Agreement. The Exchange Agreement contained a repurchase provision enabling Comdata to require NTS to repurchase any of the assets covered by the Exchange Agreement. Thereafter, NTS changed its name to IPS Card Solutions, Inc. ("IPS").

Time passed without much progress in reducing the $834,750.66 debt. In the summer of 1998, Comdata declared the Promissory Note and Debt Reduction Agreement in default and terminated the Marketing Services Agreement. In February 1999, facing the prospect that Comdata would call upon him and the Boyd Trust to honor their Guaranty Agreement, Mr. Boyd and the Boyd Trust ("the Boyd parties") filed suit in Memphis seeking rescission of their guaranties and damages for Comdata's alleged breach of the Marketing Services Agreement. On July 30, 1999, after their Memphis suit was dismissed for improper venue, the Boyd parties filed the same complaint in the Chancery Court for Williamson County.

The Boyd parties' suit prompted Comdata to invoke its rights under the Exchange Agreement to require IPS, as NTS's successor, to repurchase the NTS assets. During the discussions that followed, Comdata and IPS negotiated not only the terms of a Purchase Agreement for the note but

---

[1] Sovryn, Inc. is a Tennessee corporation engaged in the receivable financing business. Mr. Boyd is its president and sole stockholder.

[2] The Boyd Revocable Inter-Vivos Trust is a California Trust created by Mr. Boyd and Jan E. Boyd, his wife.

also the terms of a Joint Defense Agreement with regard to the litigation pending in the trial court.[3] On August 17, 1999, while the negotiations between Comdata and IPS were taking place, the Boyd parties filed interrogatories and requests for production of documents seeking documents and other communications between Comdata and NTS regarding the Boyd parties, Fidelity Group, or Sovryn.[4]

Two significant developments occurred on November 15, 1999. First, Comdata and IPS executed a Purchase Agreement in which Comdata assigned the promissory note and debt reduction agreement to IPS. Second, Comdata filed its response to the Boyd parties' interrogatories and request for production of documents. Citing the attorney-client privilege and the work product doctrine, Comdata objected to producing (1) the drafts of the Purchase Agreement covering the note, (2) the correspondence between Comdata's and IPS's lawyers regarding the Purchase Agreement, (3) the proposed Joint Defense Agreement, and (4) the correspondence between the lawyers for Comdata and IPS regarding the proposed Joint Defense Agreement.

On February 3, 2000, IPS launched what it intended to be a preemptive strike by filing suit in the United States District Court for the Southern District of New York to enforce the Boyd parties' guaranties. The Boyd parties responded on February 14, 2000, by moving to amend their complaint in this proceeding to add IPS as a defendant. Three days later, they moved to compel Comdata to respond to their interrogatories and request for production of documents. On February 29, 2000, the trial court filed an order permitting the Boyd parties to amend their complaint to add IPS as a defendant. The amended complaint was filed on March 3, 2000. On April 17, 2000, the trial court granted the motion to compel but also authorized Comdata to pursue an interlocutory appeal to this court. Ten days later, Comdata applied to this court for an interlocutory appeal. We granted Comdata's application on May 11, 2000.[5]

## II.
### THE STANDARD OF REVIEW

We turn first to the standard of review. Comdata's appeal challenges the trial court's decisions regarding the scope of pre-trial discovery and its invocation of the attorney-client privilege and the work product doctrine. Decisions regarding discovery issues address themselves to a trial

---

[3]The lawyers representing Comdata and IPS discussed the terms of the proposed Joint Defense Agreement and exchanged drafts of the agreement, but Comdata and IPS never entered into a joint defense agreement.

[4]Specifically, the request for production of documents sought "[a]ll correspondence, memoranda, notes or other documents reflecting, concerning or evidencing any communications between . . . [Comdata] and NTS concerning the Plaintiffs, Fidelity and/or Sovryn" and "[a]ll correspondence, memoranda, notes or other documents reflecting, concerning or evidencing any communication between . . . [Comdata] and NTS regarding the negotiation, performance, nonperformance, breach and/or any aspect of the Agreements."

[5]In the meantime, the Boyd parties had requested the United States District Court to abstain in deference to this proceeding or, in the alternative, to dismiss IPS's complaint because the forum was not convenient. On May 12, 2000, the United States District Court filed an opinion and order granting the motion to abstain based on the reasoning of *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S. Ct. 1236, 1246 (1976). *IPS Card Solutions, Inc. v. Boyd*, No. 00 CIV.0776 (MBM), 2000 WL 620213, at *4 (S.D.N.Y. May 12, 2000).

court's discretion, *Benton v. Snyder*, 825 S.W.2d 409, 416 (Tenn. 1992); *Payne v. Ramsey*, 591 S.W.2d 434, 436 (Tenn. 1979); *Harrison v. Greeneville Ready-Mix, Inc.*, 220 Tenn. 293, 302-03, 417 S.W.2d 48, 52 (1967), as do decisions regarding the application of the attorney-client privilege and the work product doctrine. *In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir. 2000); *Frontier Ref. Corp. v. Gorman-Rupp Co.*, 136 F.3d 695, 699 (10th Cir. 1998). Accordingly, the appellate courts must review these decisions using the "abuse of discretion" standard of review.

While the "abuse of discretion" standard limits the scope of our review of discretionary decisions, it does not immunize these decisions completely from appellate review. *Duncan v. Duncan*, 789 S.W.2d 557, 561 (Tenn. Ct. App. 1990). Even though it prevents us from second-guessing the trial court, *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999), or from substituting our discretion for the trial court's discretion, *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998); *State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000), it does not prevent us from examining the trial court's decision to determine whether it has taken the applicable law and the relevant facts into account. *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996). We will not hesitate to conclude that a trial court "abused its discretion" when the court has applied an incorrect legal standard, has reached a decision that is illogical, has based its decision on a clearly erroneous assessment of the evidence, or has employed reasoning that causes an injustice to the complaining party. *Clinard v. Blackwood*, 46 S.W.3d 177, 182 (Tenn. 2001); *Buckner v. Hassell*, 44 S.W.3d 78, 83 (Tenn. Ct. App. 2000); *In re Paul's Bonding Co.*, 62 S.W.3d 187, 194 (Tenn. Crim. App. 2001); *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999).

When called upon to review a discretionary decision, we will review the trial court's underlying factual findings using the preponderance of the evidence standard in Tenn. R. App. P. 13(d). However we will review the trial court's purely legal determinations de novo without a presumption of correctness. *Brown v. Birman Managed Care, Inc.*, 42 S.W.3d 62, 66 (Tenn. 2001); *Burlew v. Burlew*, 40 S.W.3d 465, 470 (Tenn. 2001); *see also In re Grand Jury Proceeding*, 156 F.3d 1038, 1042 n.1 (10th Cir. 1998). By definition, a trial court "abuses its discretion" when it makes an error of law. *Koon v. United States*, 518 U.S. 81, 100, 116 S. Ct. 2035, 2047 (1996).

### III.
### THE DRAFTS OF THE JOINT DEFENSE AGREEMENT

The trial court determined that Comdata could not invoke the common interest privilege to challenge several of the Boyd parties' interrogatories and requests for production of documents. On this appeal, Comdata asserts that the trial court erred by determining that it could not use the common interest privilege to avoid producing copies of correspondence and other documents relating to its negotiations with IPS regarding a proposed Joint Defense Agreement. We have determined that Tennessee recognizes the common interest privilege as an extension of the attorney-client privilege and that Comdata has demonstrated, by a preponderance of the evidence, that it is entitled to invoke this privilege to prevent the discovery of the documents involving the proposed Joint Defense Agreement.

## A.

The law favors making all relevant evidence available to the trier of fact. Neil P. Cohen, et al., *Tennessee Law of Evidence* § 5.01[2] (4th ed. 2000). Accordingly, Tenn. R. Evid. 501 limits the ability of parties and witnesses to refuse to disclose information or documents to the "privileges" provided by the constitution, statutes, common law, and rules promulgated by the Tennessee Supreme Court. One of the privileges, in fact the oldest privilege,[6] recognized in Tennessee both at common law[7] and by statute[8] is the attorney-client privilege. This privilege serves the administration of justice by encouraging full and frank communication between clients and their attorneys by sheltering these communications from compulsory disclosure. *Upjohn Co. v. United States*, 449 U.S. at 389, 101 S. Ct. at 682; *Bryan v. State*, 848 S.W.2d 72, 79 (Tenn. Crim. App. 1992).

The attorney-client privilege is not absolute, nor does it cover all communications between a client and his or her attorney. The communications must involve the subject matter of the representation[9] and must be made with the intention that they will be kept confidential.[10] The privilege applies not only to the client's communications but also to the attorney's communications to his or her client when the attorney's communications are specifically based on the client's confidential communications or when disclosing the attorney's communications would, directly or indirectly, reveal the substance of the client's confidential communications. *Burke v. Tennessee Walking Horse Breeders' & Exhibitors' Ass'n*, No. 01A01-9611-CH-00511, 1997 WL 277999, at *11 (Tenn. Ct. App. May 28, 1997) (No Tenn. R. App. P. 11 application filed); *Bryan v. State*, 848 S.W.2d at 80.

The attorney-client privilege "belongs" to the client. *Smith County Educ. Ass'n v. Anderson*, 676 S.W.2d 328, 333 (Tenn. 1984); *State v. Parker*, 932 S.W.2d 945, 955 (Tenn. Crim. App. 1996). Accordingly, a client may waive[11] the privilege either by communicating in the presence of others who are not bound by the privilege, *Hazlett v. Bryant*, 192 Tenn. at 257, 241 S.W.2d at 123, or by

---

[6]Courts and text writers have characterized the attorney-client privilege as the oldest privilege for confidential communication known to the common law. *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S. Ct. 677, 682 (1981); *Federal Ins. Co. v. Arthur Anderson & Co.*, 816 S.W.2d 328, 330 (Tenn. 1991); Edward J. Imwinkelried, *The New Wigmore: Evidentiary Privileges* § 6.2.4, at 471 (2002); Edna S. Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine* 2 (4th ed. 2001) ("Epstein").

[7]*Johnson v. Patterson*, 81 Tenn. 626, 649 (1884) (holding that the codification of the attorney-client privilege embodies the common-law rule); *McMannus v. State*, 39 Tenn. (2 Head) 213, 215-16 (1858).

[8]Tenn. Code Ann. § 23-3-105 (1994).

[9]*Jackson v. State*, 155 Tenn. 371, 376, 293 S.W. 539, 540 (1927); *Johnson v. Patterson*, 81 Tenn. at 649 (holding that "there are many transactions between attorney and client, that have no element of confidence in them, of which . . . [the attorney] is competent to testify").

[10]*Hazlett v. Bryant*, 192 Tenn. 251, 258, 241 S.W.2d 121, 124 (1951).

[11]*Smith County Educ. Ass'n v. Anderson*, 676 S.W.2d at 333; *see also* Tenn. S. Ct. R. 8, DR 4-101(B)(1).

voluntarily divulging the communication to third parties. *Taylor v. State*, 814 S.W.2d 374, 377 (Tenn. Crim. App. 1991). It is also subject to exceptions grounded in public policy that do not depend on a client's waiver of the privilege. Tenn. S. Ct. R. 8, DR 4-101(C)(2), (4).[12]

**B.**

The common interest privilege[13] recognizes the advantages of, and even necessity for, an exchange or pooling of information among attorneys representing parties sharing a common legal interest in litigation. *Transmirra Prods. Corp. v. Monsanto Chem. Co.*, 26 F.R.D. 572, 579 (S.D.N.Y. 1960). It extends the scope of the attorney-client privilege[14] by providing an exception to the general rule that communications made in the presence of or shared with third parties are not protected by the attorney-client privilege.[15] While the common interest privilege was originally applied in criminal cases, *Chahoon v. Commonwealth*, 62 Va. (21 Gratt.) 822 (1871), it has long since been extended to civil proceedings. *In re Grand Jury Subpoenas, 89-3 & 89-4, John Doe 89-129*, 902 F.2d 244, 249 (4th Cir. 1990); *Aiken v. Texas Farm Bureau Mut. Ins. Co.*, 151 F.R.D. 621, 623 (E.D. Tex. 1993); *Visual Scene, Inc. v. Pilkington Bros.*, 508 So. 2d 437, 439 n.2 (Fla. Dist. Ct. App. 1987); *Aetna Cas. & Sur. Co. v. Certain Underwriters at Lloyd's of London*, 676 N.Y.S.2d at 732. The common interest privilege has been specifically recognized by the Tennessee Supreme Court. *Vance v. State*, 190 Tenn. 521, 529-30, 230 S.W.2d 987, 990-91 (1950).

The common interest privilege widens the circle of persons to whom clients may disclose privileged communications. It permits the participants in a joint defense to communicate among themselves and with their attorneys on matters of common legal interest for the purpose of coordinating their joint legal strategy. *United States v. Henke*, 222 F.3d 633, 637 (9th Cir. 2000); 1 Paul R. Rice, *Attorney-Client Privilege in the United States* § 4:35, at 192 (2d ed. 1999) ("*Attorney-Client Privilege in the United States*"). In the circumstances where the common interest

---

[12]The Code of Professional Responsibility specifically permits attorneys to reveal client confidences and secrets when the information is necessary to prevent a client from committing a crime, to collect a fee, or to defend against an accusation of wrongful conduct. It also permits attorneys to reveal client confidences and secrets when permitted under the disciplinary rules or required by law or a court order.

[13]The common interest privilege has frequently been referred to as the "joint defense privilege" because the privilege was originally and is now most commonly invoked in the context of a joint defense. The more accurate term is "common interest" privilege. *In re Grand Jury Subpoenas 89-3 & 89-4, John Doe 89-129*, 902 F.2d at 249; *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989); *Hicks v. Commonwealth*, 439 S.E.2d 414, 416 (Va. Ct. App. 1994); Restatement (Third) of the Law Governing Lawyers § 76 cmt. b (2000). Accordingly, we will refer to the privilege as the "common interest privilege."

[14]*United States v. Evans*, 113 F.3d 1457, 1467 (7th Cir. 1997); *United States v. Schwimmer*, 892 F.2d at 243-44; *Volpe v. Conroy, Simberg & Ganon, P.A.*, 720 So. 2d 537, 539 (Fla. Dist. Ct. App. 1998); *Aetna Cas. & Sur. Co. v. Certain Underwriters at Lloyd's of London*, 676 N.Y.S.2d 727, 732 (N.Y. 1998).

[15]The common interest privilege does not provide an independent basis for refusing to reveal information or produce documents that would not otherwise be protected by the attorney-client privilege. *United States v. Agnello*, 135 F. Supp. 2d 380, 382 (E.D.N.Y. 2001); *Securities Investor Protection Corp. v. Stratton Oakmont, Inc.*, 213 B.R. 433, 435 (Bankr. S.D.N.Y. 1997); Restatement (Third) of the Law Governing Lawyers § 76 cmt. d.

privilege applies, it protects not only the communications between any of the clients and attorneys regardless of whether the communicating client's own attorney is present but also the communications between any of the clients' respective attorneys. *United States v. Schwimmer*, 892 F.2d at 244; *Bank of Brussels Lambert v. Credit Lyonnais Swisse, S.A.*, 160 F.R.D. 437, 446 (S.D.N.Y. 1995); *In re Monsanto Co.*, 998 S.W.2d 917, 922 (Tex. App. 1999).

Although originally limited to cases involving actual co-defendants, the courts now routinely apply the common interest privilege to potential co-defendants, *In re Grand Jury Subpoenas, 89-3 & 89-4, John Doe 89-129*, 902 F.2d at 249; *Schachar v. American Acad. of Ophthalmology, Inc.*, 106 F.R.D. 187, 191 (N.D. Ill. 1985), and others who have a community of interest in the subject matter of the communications. *Attorney-Client Privilege in the United States* § 4:35, at 201. However, the privilege applies only to communications given in confidence, *United States v. Weissman*, 195 F.3d 96, 99 (2d Cir. 1999), and intended and reasonably believed to be part of an on-going and joint effort to set up a common legal strategy. *United States v. Schwimmer*, 892 F.2d at 243; *In re Bevill, Bresler & Schulman Asset Mgt. Corp.*, 805 F.2d 120, 126 (3d Cir. 1986); *Griffith v. Davis*, 161 F.R.D. 687, 692 n.6 (C.D. Cal. 1995); *Bass Pub., Ltd. v. Promus Companies, Inc.*, 868 F. Supp. 615, 621 (S.D.N.Y. 1994).

The proponent of the common interest privilege has the burden of establishing the necessary elements of the privilege. *In re Grand Jury Proceedings*, 156 F.3d 1038, 1042-43 (10th Cir. 1998); *United States v. Evans*, 113 F.3d at 1467; *United States v. Moss*, 9 F.3d 543, 550 (6th Cir. 1993). To carry its burden, the proponent must demonstrate: (1) that the otherwise privileged information was disclosed due to actual or anticipated litigation, (2) that the disclosure was made for the purpose of furthering a common interest in the actual or anticipated litigation,[16] (3) that the disclosure was made in a manner not inconsistent with maintaining its confidentiality against adverse parties, and (4) that the person disclosing the information has not otherwise waived its attorney-client privilege for the disclosed information. *In re Sealed Case*, 29 F.3d 715, 719 n.5 (D.C. Cir. 1994); *United States v. Bay State Ambulance & Hosp. Rental Servs., Inc.*, 874 F.2d 20, 28 (1st Cir. 1989); *In re Bevill, Bresler & Schulman Asset Mgt. Corp.*, 805 F.2d at 126; *Travelers Cas. & Sur. Co. v. Excess Ins. Co.*, 197 F.R.D. 601, 606 (S.D. Ohio 2000); Restatement (Third) of the Law Governing Lawyers § 76(1).

The common interest privilege is not limited to communications and documents generated during the period of time when persons are cooperating on a common defense. It also includes pre-existing confidential communications and documents that are shared during the common enterprise. *In re Grand Jury Subpoenas 89-3 & 89-4, John Doe 89-129*, 902 F.2d at 249-50. Accordingly, when a party invokes the common interest privilege, the court must focus on the circumstances surrounding the disclosure of the communications or documents rather than on when communications or documents were generated. *Attorney-Client Privilege in the United States* § 4:38, at 238.

---

[16]The cooperation required to invoke the common interest privilege must be more than cooperation for business purposes or to address a common problem. The cooperation must be in the furtherance of a joint strategy for actual or anticipated litigation. *United States v. Weissman*, 195 F.3d at 100; *Walsh v. Northrup Grumman Corp.*, 165 F.R.D. 16, 19 (E.D.N.Y. 1996); *Medcom Holding Co. v. Baxter Travenol Lab.*, 689 F. Supp. 841, 845 (N.D. Ill. 1988).

**C.**

The April 17, 2000 order offers little insight into the trial court's reasons for refusing to permit Comdata to invoke the common interest privilege.[17] There are, however, only two possibilities. First, the trial court could have concluded that Comdata failed to carry its burden of proof regarding the elements of the privilege. Second, it could have concluded that Comdata was not entitled to invoke the common interest privilege because Comdata and IPS never actually signed the proposed Joint Defense Agreement their lawyers had been negotiating.

The trial court's decision, to the extent it rests on the conclusion that Comdata did not carry its burden of proof, is based on a clearly erroneous assessment of the evidence. The only evidence regarding the circumstances surrounding Comdata's and IPS's negotiations over the Joint Defense Agreement was provided by one of the lawyers actually representing Comdata in this litigation. In an affidavit[18] dated March 10, 2000, the lawyer explained:

> 5.      In the beginning of the drafting process, it was contemplated that there would be two (2) separate agreements: 1) an agreement for the retransfer of the note from Comdata to IPS and 2) a defense agreement whereby IPS would provide a defense to Comdata in the pending action. For most of the negotiations, the two (2) agreements were jointly discussed and it was assumed that they would be executed contemporaneously with one another. For the most part, the Joint Defense Agreement was proposed and discussed between myself, as attorney for Comdata, and the attorney for IPS. Occasionally, general counsel for Comdata and/or my partner, Kenneth M. Bryant, participated in the discussions. In general terms, these drafts set forth how the defense of the plaintiffs' lawsuit was going to be handled, including areas of defense strategy wherein Comdata and IPS shared common interests and goals. These drafts also relay communications from Comdata and contain my hand-written notes. The text of these drafts and my notes together reflect my legal theories of the defense, opinions about the case, and other

---

[17]The trial court made no findings of fact or conclusions of law regarding this issue.

[18]An affidavit of an attorney is an appropriate way to provide the evidence needed to support a common interest privilege claim. Lawyers, as officers of the court, are held to the utmost good faith in the discharge of their duties. *White v. McBride*, 937 S.W.2d 796, 802 (Tenn. 1996). Accordingly, the courts accept affidavits from lawyers as sufficient to invoke attorney-client privilege and the work product doctrine. *State v. Bobo*, 724 S.W.2d 760, 765 (Tenn. Crim. App. 1981) (attorney-client privilege); *Arnold v. City of Chattanooga*, 19 S.W.3d 779, 784 (Tenn. Ct. App. 1999) (work product doctrine). Extending the application of this evidentiary device to the common interest privilege is logical since the common interest privilege is nothing more than an extension of the scope of the attorney-client privilege. Other courts have likewise approved the use of affidavits. *See, e.g., Royal Surplus Lines Ins. Co v. Sofamor Danek Group, Inc.*, 190 F.R.D. 463, 473 (W.D. Tenn. 1998); *Chan v. City of Chicago*, 162 F.R.D. 344, 345-46 (N.D. Ill. 1995); *Visual Scene, Inc. v. Pilkington Bros, PLC*, 508 So.2d at 441.

thought processes and mental impressions. My thoughts and opinions on behalf of Comdata were shared with only attorneys for IPS with the intent they remain confidential, and with the understanding and presumption that Comdata and IPS would be cooperating fully in defending plaintiffs' claims that were common to both companies. At all times material hereto, it was recognized that IPS, as well as Comdata, might be a party litigant. It was also recognized that Comdata and IPS would have common interests against the plaintiffs, as adversary parties in litigation.

6. Comdata and IPS could not reach final agreement on the defense agreement, but on or about November 15, 1999, they did agree on the Note Purchase Agreement. As attorney for Comdata, I represented Comdata in these negotiations and prepared and edited the drafts of the Note Purchase Agreement and defense agreement. These drafts were prepared with this particular lawsuit in mind and with the understanding that IPS could become a party litigant in this action.

This excerpt supplies all the ingredients needed to invoke the common interest privilege. When the lawyer filed his affidavit, IPS was not yet a party to the lawsuit, but both Comdata and IPS contemplated that IPS would become a party if it acquired the promissory note and associated Guaranty Agreements from Comdata. By the time of the hearing on the motion to compel, the trial court had permitted Mr. Boyd and the Boyd Trust to amend their complaint to add IPS as a party defendant. Thus, by April 2000, both Comdata and IPS were actual defendants and were facing common legal claims seeking the rescission of the Guaranty Agreements, restitution of $50,000, and other unspecified damage claims. The circumstances surrounding the discussions of the proposed Joint Defense Agreement make it equally clear that the lawyers representing Comdata and IPS intended and reasonably believed that their communications regarding the Joint Defense Agreement would be kept in confidence and that they made their disclosures in a way reasonably calculated to maintain confidentiality against adverse third parties. Finally, the record contains no evidence of conduct by either Comdata or its lawyers indicating that Comdata had waived its privilege with regard to the communications relating to the Joint Defense Agreement.

The trial court likewise may have applied an incorrect legal standard if its decision to grant the motion to compel hinged on the fact that Comdata and IPS ultimately did not sign the proposed Joint Defense Agreement. The trial court overlooked that parties may assert the common interest privilege even if they have not executed some sort of formal agreement. *Katz v. AT&T Corp.*, 191 F.R.D. 433, 437 (E.D. Penn. 2000); Restatement (Third) of the Law Governing Lawyers § 76 cmt. c; *Attorney-Client Privilege in the United States* § 4:35, at 195. While a well-drafted joint defense agreement makes it simple for the courts to determine whether the parties intended to participate in a joint defense, an executed agreement is not a necessary ingredient to a common interest privilege claim. *Power Mosfet Techs. v. Siemens A.G.*, No. 2:99CV168, 2000 U.S. Dist. LEXIS 19898, at *10 (E.D. Tex. Oct. 31, 2000).

The trial court also overlooked that the compelled disclosure of the existence of a joint defense agreement is an improper intrusion into the preparation of a litigant's case, *United States v. Bicoastal Corp.*, No. 92-CR-261, 1992 U.S. Dist. LEXIS 21445, at *18 (N.D.N.Y. Sept. 28, 1992), and the joint defense agreements are themselves privileged. *Waller v. Financial Corp. of Am.*, 828 F.2d 579, 584 (9th Cir. 1987) (warning against the disclosure of a joint defense agreement); *A.I. Credit Corp. v. Providence Washington Ins. Co.*, No. 96 Civ. 7955 (AGS) (AJP), 1997 U.S. Dist. LEXIS 6223, at *12 (S.D.N.Y. May 7, 1997). Thus, while the courts may review joint defense agreements in chambers,[19] the agreements are not discoverable by other parties.

If a joint defense agreement itself is privileged, it would be anomalous to conclude that drafts of a joint defense agreement are discoverable. Obviously, a joint defense agreement must be preceded by negotiations regarding the terms of the agreement. Holding that communications involving a proposed joint defense agreement are not privileged unless the parties actually enter into a joint defense agreement will place the parties in a "Catch-22" situation and will seriously impair efforts to negotiate a joint defense agreement. Accordingly, communications occurring during the negotiation of a proposed joint defense agreement are privileged, even if the parties have not, or ultimately do not, unite in a common enterprise or execute a formal agreement. *Eisenberg v. Gagnon*, 766 F.2d 770, 787-88 (3d Cir. 1985) (finding that communications in an effort to establish a joint defense are privileged); *Power Mosfet Techs. v. Siemens A.G.*, 2000 U.S. Dist. LEXIS 19898, at *11; *Katz v. AT&T Corp.*, 191 F.R.D. at 437; *Sig Swiss Indus. Co. v. Fres-Co Sys., USA, Inc.*, No. 91-0699, 1993 U.S. Dist. LEXIS 3576, at *7 (E.D. Penn. Mar. 17, 1993); *Aetna Cas. & Sur. Co. v. Certain Underwriters at Lloyd's of London*, 676 N.Y.S.2d at 733.

We have concluded that the undisputed evidence shows that the lawyers for Comdata and IPS were negotiating the proposed joint defense agreement at a time when Comdata and IPS were either actual or anticipated defendants in the lawsuit filed by the Boyd parties. Their communications involved their common interest in and joint defense against claims made against them both and occurred in circumstances reasonably anticipated to keep these communications privileged. Even though Comdata and IPS ultimately did not sign the formal joint defense agreement, Comdata was entitled to assert the common interest privilege with regard to the draft agreement itself and the communications relating to this draft. Accordingly, the trial court erred when it granted the motion to compel the production of these communications and documents.

## IV.
### THE PURCHASE AGREEMENT FOR PROMISSORY NOTE AND DEBT REDUCTION AGREEMENT

Comdata also takes issue with the trial court's order compelling it to provide the Boyd parties with all preliminary drafts of the agreement between Comdata and IPS to repurchase the Promissory Note and Debt Reduction Agreement and the Guaranty Agreement as well as all correspondence relating to the repurchase agreement. It asserts that the substance of these documents and the handwritten notes and annotations on these documents are the work product of its attorney and that

---

[19] *Beneficial Franchise Co. v. Bank One, N.A.*, 205 F.R.D. 212, 220 (N.D. Ill. 2001); *McNally Tunneling Corp. v. City of Evanston*, No. 00C6979, 2001 U.S. Dist. LEXIS 17090, at *14 (N.D. Ill. Oct. 18, 2001).

the documents should not be disclosed because they contain its attorney's mental impressions and opinions as well as legal theories about the case. In light of the fact that Comdata has already produced the final version of the November 15, 1999 Purchase Agreement, we have determined that the preliminary drafts of the agreement and the correspondence relating to these drafts are not only work product but are also irrelevant to the subject matter involved in the pending action.

## A.

The concept that an attorney's "work product" could be shielded from pretrial discovery has its roots in *Hickman v. Taylor*, 329 U.S. 495, 67 S. Ct. 385 (1947). There, the plaintiff's attorney, without any showing of necessity or justification, served an interrogatory on opposing counsel requesting the written statements, private memoranda, and personal recollections of any oral statements prepared or obtained by the lawyer in preparation for a wrongful death trial. The trial court determined that the material sought was not protected by the attorney-client privilege and ordered the defense attorney to comply with the interrogatory. When the attorney refused, the court held him in contempt. The United States Supreme Court unanimously agreed that the defense attorney should not have been convicted of contempt. Noting the "general policy against invading the privacy of an attorney's course of preparation [for trial],"[20] the Court held that material such as that requested by the plaintiff's attorney need not be disclosed without some showing that the materials sought were essential to the preparation of the requesting party's case. *Hickman v. Taylor*, 329 U.S. at 511, 67 S. Ct. at 394.

The requirement in *Hickman v. Taylor* of a showing of "necessity or justification"[21] proved difficult to apply. The courts interpreted it as a "good cause" requirement, but there was substantial confusion and disagreement over whether the requirement could be satisfied by a showing of relevance and lack of privilege or whether it required an additional showing of necessity. The courts generally required more than a showing of relevance and lack of privilege. Fed. R. Civ. P. 26, committee note of 1970, *reprinted in*, 6 James W. Moore et al., *Moore's Federal Practice* § 26App.05[2] (Matthew Bender Authority Federal Practice CD-ROM, rel. 26, Dec. 2001) ("*Moore's Federal Practice*"); *Federal Practice and Procedure* § 2023, at 327.

In 1970, twenty-three years after *Hickman v. Taylor*, Fed. R. Civ. P. 26 was broadened to cover all pretrial discovery.[22] One of the 1970 amendments, Fed. R. Civ. P. 26(b)(3), specifically addressed the discovery of trial preparation materials and codified the work product doctrine first recognized in *Hickman v. Taylor*. Fed. R. Civ. P. 26(b)(3) attempted to strike a balance between the

---

[20]*Hickman v. Taylor*, 329 U.S. at 512, 67 S. Ct. at 394; *see also Memphis Publ'g Co. v. City of Memphis*, 871 S.W.2d 681, 689 (Tenn. 1994) (recognizing an "attorney's right to conduct the client's case with a certain degree of privacy").

[21]*Hickman v. Taylor*, 329 U.S. at 510, 67 S. Ct. at 393.

[22]As originally adopted in 1937, Fed. R. Civ. P. 26 governed only the taking of pretrial depositions and their use at trial.

policy of full and open discovery[23] and the necessity of protecting an attorney's preparation for trial under the adversary system. *Fletcher v. Union Pac. R.R.*, 194 F.R.D. 666, 670 (S.D. Cal. 2000); *Zirn v. VLI Corp.*, 621 A.2d 773, 782 (Del. 1993); *Moore's Federal Practice* § 26.70[1]; Restatement (Third) of the Law Governing Lawyers § 87 cmt. b.

The promulgation of Fed. R. Civ. P. 26(b)(3) had a profound effect on the scope and application of the work product doctrine in state courts. Thirty-four states, including Tennessee, eventually adopted the 1970 version of the rule verbatim,[24] while ten other states adopted rules containing substantially similar language. *Federal Practice and Procedure* § 2023, at 334-35.

The work product doctrine now applies to both civil and criminal litigation. *Coe v. State*, 17 S.W.3d 193, 214 (Tenn. 2000); Tenn. R. Civ. P. 26.02(3); Tenn. R. Crim. P. 16(a)(2), 16(b)(2). It prevents litigants from taking a free ride on the research and thinking of their adversary's lawyer. *United States v. Frederick*, 182 F.3d 496, 500 (7th Cir. 1999). The doctrine embodies the policy that attorneys, doing the sort of work that attorneys do to prepare a case for trial, should not be hampered by the prospect that they might be called upon at any time to hand over the results of their work to their adversaries. *Duplan Corp. v. Moulinage et Retorderie de Chavanoz*, 487 F.2d 480, 482-83 (4th Cir. 1973); *Downing v. Bowater, Inc.*, 846 S.W.2d 265, 267 (Tenn. Ct. App. 1992) (quoting *In re Murphy*, 560 F.2d 326, 334 (8th Cir. 1977)). Lawyers preparing for litigation should be permitted to assemble information, to separate the relevant facts from the irrelevant, and to use the relevant facts to plan and prepare their strategy without undue and needless interference. *Wells v. Liddy*, No. 01-1266, 2002 U. S. App. LEXIS 3356, at *30 (4th Cir. Mar. 1, 2002).

## B.

Like its federal counterpart, the standards and procedures for addressing a claim of work product are provided in Tenn. R. Civ. P. 26.02(3). The rule suggests sequential steps with shifting burdens of proof that litigants and courts should follow when considering work product doctrine claims. *Hendrick v. Avis Rent A Car Sys.*, 916 F. Supp. 256, 260 n.3 (W.D.N.Y. 1996); *In re Air Crash Disaster at Detroit Metro. Airport*, 130 F.R.D. 641, 644 (E.D. Mich. 1989). The explanation of these steps in *Toledo Edison Co. v. G A Techs., Inc.*, 847 F.2d 335, 339-40 (6th Cir. 1988) reflects the approach generally taken by the courts. Daisy H. Floyd, *A "Delicate and Difficult Task":*

---

[23]The same broad policy favoring the discovery of relevant, non-privileged material is reflected in Tenn. R. Civ. P. 26.02(1). *Pettus v. Hurst*, 882 S.W.2d 783, 786 (Tenn. Ct. App. 1993); *Duncan v. Duncan*, 789 S.W.2d at 560.

[24]While Tenn. R. Civ. P. 26.02(3) is identical to Fed. R. Civ. P. 26(b)(3), Tenn. R. Civ. P. 26 differs from its federal counterpart in several material respects. For example, Tennessee does did not adopt Fed. R. Civ. P. 26(b)(2) permitting the discovery of the existence and contents of insurance policies. Tennessee has also not adopted the 2000 amendment to Fed. R. Civ. P. 26(b)(1) that alters the scope of discovery as a matter of right without court authorization. While Tenn. R. Civ. P. 26.02(1) permits the discovery of any non-privileged matter "which is relevant to the subject matter involved in the pending action," Fed. R. Civ. P. 26(b)(1) now limits discovery without court approval to any non-privileged matter that is "relevant to the claim or defense of any party." As a result of the 2000 amendment to Fed. R. Civ. P. 26(b)(1), discovery of matters relevant to the subject matter involved in the pending action can only be obtained by court order upon the showing of good cause. *Federal Practice and Procedure* § 2008, at 14-15 (Supp. 2001).

*Balancing the Competing Interests for Federal Rule of Evidence 612, the Work Product Doctrine, and the Attorney-Client Privilege*, 44 Buffalo L. Rev. 101, 110-11 (1996).

In usual circumstances, discovery will begin when a party sends to an opposing party a request for discovery using one of the methods identified in Tenn. R. Civ. P. 26.01. If the party receiving the request for discovery believes that some or all of the requested documents are covered by the work product doctrine, that party need only notify the requesting party that it is declining to provide some or all of the requested documents based on the work product doctrine. At this point, if the party seeking discovery insists on obtaining the withheld documents, it may move for an order pursuant to Tenn. R. Civ. P. 37.01 to compel discovery. *Federal Practice and Procedure* § 2023, at 344.

At this juncture, the party seeking discovery, as the party seeking an order compelling discovery under Tenn. R. Civ. P. 37.01, has the burden of establishing that it is entitled to discover the documents or other materials withheld by its adversary. To carry its burden, the party seeking discovery must establish (1) that the material being sought is relevant to the subject matter involved in the pending action,[25] (2) that the material being sought is not otherwise privileged,[26] and (3) that the material being sought consists of documents or other tangible things.[27] *Toledo Edison Co. v. G A Techs., Inc.*, 847 F.2d at 339. *Infosystems, Inc. v. Ceridian Corp.*, 197 F.R.D. 303, 306 (E.D. Mich. 2000); *Miller v. Federal Express Corp.*, 186 F.R.D. 376, 387 (W.D. Tenn. 1999).

Once the party seeking discovery makes a prima facie showing that the materials it seeks are discoverable, the burden shifts to the party opposing discovery to show that the materials are work product protected by Tenn. R. Civ. P. 26.02(3). *Hammock v. Sumner County*, No. 01A01-9710-CV-00600, 1997 WL 749461, at *2 (Tenn. Ct. App. Dec. 5, 1997) (No Tenn. R. App. P. 11 application filed).[28] To invoke the work product doctrine successfully, a party must, in the words of Tenn. R. Civ. P. 26.02(3), establish (1) that the materials sought are documents or tangible things, (2) that the documents were prepared in anticipation of litigation or for trial, (3) that the documents were prepared by or for another party or by or for that other party's representative. *Caremark, Inc. v. Affiliated Computer Servs., Inc.*, 195 F.R.D. 610, 613 (N.D. Ill. 2000); *Kidwiler v. Progressive Paloverde Ins. Co.*, 192 F.R.D. 536, 542 (N.D.W. Va. 2000); *Moore's Federal Practice* § 26.70[5].

---

[25]Tenn. R. Civ. P. 26.02(1) & 26.02(3). Relevancy is extremely important at the discovery stage. *Vythoulkas v. Vanderbilt Univ. Hosp.*, 693 S.W.2d 350, 359 (Tenn. Ct. App. 1985); *Federal Practice and Procedure* § 2008, at 99. However, it is more loosely construed during discovery than it is at trial. The phrase "relevant to the subject matter involved in the pending action" has been construed "broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, 98 S. Ct. 2380, 2389 (1978); *Hickman v. Taylor*, 329 U.S. at 501, 67 S. Ct. at 388.

[26]Tenn. R. Civ. P. 26.02(1) & 26.02(3).

[27]Tenn. R. Civ. P. 26.02(3).

[28]*See also Resolution Trust Corp. v. Dabney*, 73 F.3d 262, 266 (10th Cir. 1995) (holding that the party asserting work product protection has the burden of establishing that the doctrine applies); *Hodges, Grant & Kaufmann v. United States*, 768 F.2d 719, 721 (5th Cir. 1985); *Taylor v. Temple & Cutler*, 192 F.R.D. 552, 557 (E.D. Mich. 1999); *Pina v. Espinoza*, 29 P.3d 1062, 1069 (N.M. Ct. App. 2001); *Moore's Federal Practice* § 26.70[5][a]; Epstein, at 491.

The party asserting the doctrine must also demonstrate that it has not waived its protection with regard to the documents being sought. *Amgen, Inc. v. Hoechest Marion Rousel, Inc.*, 190 F.R.D. 287, 289 (D. Mass. 2000). Parties asserting the work product doctrine are not required to spell out (1) the names and positions of the authors of the documents, (2) their responsibility in connection with the litigation, (3) the dates the documents were prepared, or (4) to whom the documents have been disclosed. *Toledo-Edison Co. v. G A Techs., Inc.*, 847 F.2d at 341.

Once the party opposing discovery establishes that the requested material is work product, the burden shifts back to the requesting party to establish that it is nonetheless entitled to the material. Epstein, at 492. The nature and extent of this burden depends upon whether the material is "ordinary" or "fact" work product or "opinion" work product. Ordinary or fact work product consists of documents prepared in anticipation of litigation or for trial that do not contain the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party in the litigation. *Pacamor Bearings, Inc. v. Minebea Co.*, 918 F. Supp. 491, 512 (D.N.H. 1996); *Moore's Federal Practice* § 26.70[5][b]. Opinion work product includes documents containing an attorney's mental impressions, conclusions, opinions, or legal theories regarding the pending litigation. *Pittman v. Frazer*, 129 F.3d 983, 988 (8th Cir. 1997); Restatement (Third) of the Law Governing Lawyers § 87(2).

To obtain ordinary or fact work product, the requesting party must establish (1) that it has a substantial need for the materials and (2) that it is unable to obtain these materials or their substantial equivalent by other means without undue hardship. Tenn. R. Civ. P. 26.02(3); *In re Perrigo Co.*, 128 F.3d 430, 437 (6th Cir. 1997); *In re Grand Jury Proceedings*, 33 F.3d 342, 348 (4th Cir. 1994); *Miller v. Federal Express Corp.*, 186 F.R.D. at 387; *Beard v. Middle Tenn. Home Health Serv.*, 144 F.R.D. 340, 342 (E.D. Tenn. 1992). The basis for the claim of "substantial need" must be articulated with specificity. *In re Grand Jury Investigation (Sun Oil)*, 599 F.2d 1224, 1232 (3d Cir. 1979); *Delco Wire & Cable, Inc. v. Weinberger*, 109 F.R.D. 680, 689-90 (E.D. Pa. 1986); Epstein, at 550. As a general matter, the party seeking discovery must establish that the facts in the requested documents are essential elements of its prima facie case. *Moore's Federal Practice* § 26.70[5][c].[29]

The burden of establishing a need for opinion work product is more onerous than that for ordinary or fact work product. *Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 577 (9th Cir. 1992). The United States Supreme Court has emphasized that the essential purpose of the work product doctrine is to protect an attorney's mental processes, *Department of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8, 121 S. Ct. 1060, 1065 (2001), and that work product revealing an attorney's mental processes is "deserving of special protection." *Upjohn Co. v. United States*, 449 U.S. 383, 400, 101 S. Ct. 677, 688 (1981). While the Court has, thus far, declined to hold that opinion work product is never discoverable, it has held that parties seeking opinion work product must make a "far stronger showing of necessity and unavailability by other means" than is

---

[29]Such documents include statements of witnesses who are unavailable due to absence, serious illness, or death. Restatement (Third) of the Law Governing Lawyers § 88 cmt. b.

required when seeking ordinary or fact work product. *Upjohn Co. v. United States*, 449 U.S. at 401-02, 101 S. Ct. 688-89.

The courts have not defined precisely when revealing opinion work product is warranted. A majority of courts have pointed out that it enjoys a nearly absolute immunity from disclosure, *Baker v. General Motors Corp.*, 209 F.3d 1051, 1054 (8th Cir. 2000); *Chaudhry v. Gallerizzo*, 174 F.3d 394, 403 (4th Cir. 1999); *Director, Office of Thrift Supervision v. Vinson & Elkins*, LLP, 124 F.3d 1304, 1308 (D.C. Cir. 1997); *P. & B. Marina, Ltd. P'ship v. Logrande*, 136 F.R.D. 50, 57 (E.D.N.Y. 1991), and that it is subject to discovery only in rare, extraordinary circumstances. *Hickman v. Taylor*, 329 U.S. at 513, 67 S. Ct. at 395; *Gundacker v. Unisys Corp.*, 151 F.3d 842, 848 (8th Cir. 1998); *In re Sealed Case*, 856 F.2d 268, 273 (D.C. Cir. 1988); Restatement (Third) of the Law Governing Lawyers § 89. These circumstances include those in which the litigation itself or one of the litigants puts the attorney's work product at issue by asserting claims or defenses based on the "advice of counsel," by calling an attorney as an expert witness, or another circumstance in which an attorney's conduct is a central issue in a case. Epstein, at 574 & 589; Restatement (Third) of the Law Governing Lawyers § 92.

## C.

We now turn to the discovery of the drafts of the Purchase Agreement executed on November 15, 1999, and the correspondence between the lawyers for Comdata and IPS relating to this agreement. We have determined that the trial court erred by ordering Comdata to provide these documents to the Boyd parties for four reasons. First, the Boyd parties failed to establish that the requested documents contained information that is relevant to the subject matter involved in this action. Second, Comdata established that the requested documents contain opinion work product. Third, Comdata demonstrated that it has not waived the confidentiality of these documents. Finally, the Boyd parties have failed to demonstrate that this case involves one of the rare circumstances warranting the discovery of opinion work product.

### 1.
### The Relevance of the Requested Documents

Two agreements executed on January 15, 1998 are at the heart of this litigation – the Marketing Services Agreement and the Guaranty Agreement obligating the Boyd parties to pay Fidelity General's and Sovryn's debt in the event of default.[30] Comdata and IPS claim that the Boyd parties must honor their guaranty agreement because Fidelity Group and Sovryn defaulted on the Promissory Note and Debt Reduction Agreement. For their part, the Boyd parties assert that they should be excused from their guaranty obligations because Comdata breached the Marketing

---

[30]The Promissory Note and Debt Reduction Agreement was also executed on January 15, 1998. While it plays an important role in this case, its role is not as pivotal as the other two contracts signed on January 15, 1998 because there appears to be little argument that Fidelity Group and Sovryn defaulted on the promissory note by failing to reduce the debt as agreed.

Services Agreement and made material misrepresentations regarding its intended performance under this agreement.

With the case in this posture, Tenn. R. Civ. P. 26.02(1) placed the initial burden on the Boyd parties to establish that the requested documents contained information relevant to (1) Comdata's obligations under the Marketing Services Agreement, (2) Comdata's representations that induced the Boyd parties to approve the assignment of the contracts to Comdata and to sign the Guaranty Agreement, and (3) the Boyd parties' obligations under the Guaranty Agreement. The Boyd parties have not carried this burden.

The rights and obligations of the parties to a written contract are governed by the terms of the contract, *Hillsboro Plaza Enters. v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993), not by the parties' statements during their negotiations or drafts of the final contract. *Faithful v. Gardner*, 799 S.W.2d 232, 235 (Tenn. Ct. App. 1990) (holding that the existence of a written contract gives rise to the presumption that the parties have reduced their prior agreements to writing); *GRW Enters., Inc. v. Davis*, 797 S.W.2d 606, 610 n.2 (Tenn. Ct. App. 1990) (stating that negotiations and agreements are deemed to be integrated into a written contract when the parties intend the contract to be a complete expression of their agreement). Thus, a court's role is to enforce an unambiguous contract as it is written unless the contract is being challenged based on fraud or mistake. *Wills & Wills, L.P. v. Gill*, 54 S.W.3d 283, 286 (Tenn. Ct. App. 2001). When called upon to enforce a written contract, the court must avoid favoring either party, *Marshall v. Jackson & Jones Oils, Inc.*, 20 S.W.3d 678, 682 (Tenn. Ct. App. 1999), and must avoid relieving either party of their contractual obligations simply because these obligations have turned out to be burdensome. *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 597-98 (Tenn. Ct. App. 1999).

The Boyd parties' contractual rights and obligations with regard to Comdata and IPS are governed by the January 15, 1998 Consent to Assignment and Release and the three other contracts executed on January 15, 1998. Their breach of contract claim against Comdata hinges on the Marketing Services Agreement. The extent of their obligation to guarantee Fidelity Group's and Sovryn's debt is controlled by the Guaranty Agreement. Finally, their claims for rescission, restitution, unjust enrichment, and fraudulent inducement to contract all hinge on Comdata's representations prior to mid-January 1995 regarding its anticipated performance obligations under the Marketing Services Agreement.

The instruments that provide the foundation for all the claims and counterclaims in this case were executed on or before January 17, 1998. The scope of the parties' rights and obligations depends on the language of these contracts, not upon whether Comdata or IPS currently owns these contracts. While Comdata and IPS executed a Purchase Agreement on November 15, 1999 transferring the contracts to IPS, neither of the Boyd parties were parties to this contract. Accordingly, as a matter of law, the November 15, 1999 Purchase Agreement between Comdata and

IPS could not modify the rights and obligations that had already been created by the three contracts executed approximately one year earlier.[31]

Even though the Purchase Agreement did not modify the parties' rights and obligations under the Consent to Assignment and Release and the three January 15, 1998 contracts, it could conceivably be argued that the agreement affected the Boyd parties' ability to pursue their claims against either Comdata, IPS, or both. Any such argument, however, must necessarily be based on the terms of the November 15, 1999 agreement, not on the parties' negotiations or the preliminary drafts of this agreement. Accordingly, the drafts of the November 15, 1999 Purchase Agreement and the correspondence between the lawyers for Comdata and IPS regarding the terms of this agreement could not, as a matter of law, affect the Boyd parties' ability to pursue their claims or present their defenses.[32]

The Boyd parties have failed to demonstrate how the drafts of the Purchase Agreement and the correspondence between Comdata and IPS are relevant to the subject matter involved in this action. Trial courts should deny motions to compel the discovery of documents when the moving party has failed to demonstrate that the requested documents satisfy Tenn. R. Civ. P. 26.02(1)'s standards. *American Tel. & Tel. Co. v. Cardwell*, 798 S.W.2d 761, 762 (Tenn. 1990) (reversing an order compelling the discovery of irrelevant documents); *Price v. Mercury Supply Co.*, 682 S.W.2d 924, 936 (Tenn. Ct. App. 1984) (affirming an order denying a motion to compel discovery of irrelevant documents). Accordingly, the trial court incorrectly applied Tenn. R. Civ. P. 26.02(1)'s standards when it granted the Boyd parties' motion to compel the production of the disputed documents.

**2.**
**The Requested Documents Contained Opinion Work Product**

Had the Boyd parties made the threshold showing that the drafts of the Purchase Agreement and the correspondence relating to these drafts satisfied the discoverability requirements in Tenn. R. Civ. P. 26.02(1), the burden would have shifted to Comdata to establish that these materials were work product. Comdata carried its burden. It is undisputed that the requested materials were documents – drafts of the Purchase Agreement and copies of the correspondence between Comdata and IPS relating to this agreement. It is also undisputed that these documents were prepared in

---

[31]Comdata, presumably with IPS's approval, has provided a copy of the November 15, 1999 Purchase Agreement to the Boyd parties, and thus a copy of this contract appears in the record as an exhibit to the first amended complaint. No provision in this agreement purports to modify any of the provisions in the instruments executed on or before January 17, 1998.

[32]In fact, Paragraph 6 of the final Purchase Agreement states that IPS is not assuming any obligation or liability that Comdata may have, including those arising from the Marketing Services Agreement. Accordingly, as a matter of fact, the Purchase Agreement does not impair the Boyd parties' ability to proceed directly against Comdata.

response to the litigation commenced by the Boyd parties[33] and that they were prepared by the attorneys for a party to the litigation and the attorneys for a company that was soon to be a party.

The drafts of the Purchase Agreement sought by the Boyd parties also contain Comdata's communications to its attorneys and handwritten notations and comments containing, in the words of one of Comdata's attorneys, "[his] thought processes, mental impressions, conclusions, opinions, and legal theories about this lawsuit." According to Comdata's attorney, the draft documents, even with his handwritten notations redacted, "would, in all probability . . . disclose [my] mental impressions . . . including an identification of some issues to be involved in this case."

The courts have not hesitated to give work product protection to an attorney's handwritten notes or comments prepared in anticipation of, or in preparation for, litigation. These notations and comments qualify as opinion work product if they reflect the attorney's "mental impressions, conclusions, opinions, or legal theories" even if they appear on documents that would be otherwise discoverable. *Lawrence v. Cohn*, No. 90 Civ 2396 (CSH)(MHD), 2002 U. S. Dist. LEXIS 1222, at *2-3 (S.D.N.Y. Jan. 25. 2002) (determining that an attorney's handwritten notations on an executed limited partnership agreement were work product); *Snowden v. Connaught Labs., Inc.*, 137 F.R.D. 325, 332 (D. Kan. 1991) (determining that an attorney's handwritten notations on copies of publicly filed court documents were work product).

The courts have likewise determined that draft documents prepared by attorneys in anticipation of, or in preparation for, litigation are work product if they contain information or comments not included in the final version of the document. *Andritz Sprout-Bauer, Inc. v. Beazer, Inc.*, 174 F.R.D. 609, 633 (M.D. Pa. 1997); *Union Carbide Corp. v. Dow Chem. Co.*, 619 F. Supp. 1036, 1050-51 (D. Del. 1985). An intention to disclose the document in its final form to third persons does not undermine its status as work product prior to disclosure. *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1037 (2d Cir. 1984); *Muller v. Walt Disney Prods.*, 871 F. Supp. 678, 682 (S.D.N.Y. 1994); *see also In re Grand Jury Subpoena for Documents in the Custody of Bekins Storage Co.*, 460 N.Y.S.2d 684, 691 (N.Y. Sup. Ct. 1983) (determining that drafts of partnership agreements and releases were protected by the attorney-client privilege). Thus, even drafts of settlement agreements have been found to be work product because they involve the mental processes of the attorneys involved in their preparation. *N.V. Organon v. Elan Pharmaceuticals, Inc.*, No. 99 Civ. 11674 (JGK)(RLE), 2000 U.S. Dist. Ct. LEXIS 5629, at *5-6 (S.D.N.Y. May 1, 2000); *In re Subpoena Duces Tecum Served on Rosenman & Colin*, No. M8-85 (RLE), 3:92 CV.00301 (WWE), 1996 U.S. Dist. LEXIS 13590, at *14 (S.D.N.Y. Sept. 16, 1996).

---

[33]The work product doctrine does not protect documents prepared in the regular course of business. *Simon v. G.D. Searle & Co.*, 816 F.2d 397, 401 (8th Cir. 1987); *Columbia/HCA Healthcare Corp. v. Eighth Judicial Dist. Ct.*, 936 P.2d 844, 526-27 (Nev. 1997); *Cook v. Wake County Hosp. Sys.*, 482 S.E.2d 546, 623 (N.C. Ct. App. 1997); *Federal Practice and Procedure* § 2024, at 346. However, one of Comdata's attorneys filed an affidavit stating that the drafts of the Purchase Agreement and the related correspondence were prepared after this lawsuit was filed and "with this particular lawsuit in mind." The record contains absolutely no evidence that Comdata or IPS would have entered into the November 15, 1999 Purchase Agreement or some other similar agreement had this suit not been filed. Accordingly, the Purchase Agreement was not prepared in the regular course of business.

In cases of this sort, it would be preferable for the trial court to examine the contested documents in chambers rather than relying solely on the lawyers' characterizations of the contents of the documents.[34] However, this oversight is not material in this case. The affidavit submitted by Comdata's attorney provides adequate support for the conclusion that the drafts of the Purchase Agreement containing the notations of counsel and the related correspondence contain opinion work product.

### 3.
### Comdata Did Not Waive the Confidentiality of the Withheld Documents

Even if the contested documents contain opinion work product, they would have been discoverable if Comdata had waived the confidentiality of the documents by making some testimonial use of them.[35] Litigants may not use the work product doctrine as a sword and a shield. *Arnold v. City of Chattanooga*, 19 S.W.3d at 787. Thus, they may not selectively disclose a protected document to prove a point and then invoke the work product doctrine to prevent their opponent from challenging their assertion. *Frontier Ref., Inc. v. Gorman-Rupp Co.*, 136 F.3d at 704; *Granite Partners, L.P. v. Bear, Stearns & Co.*, 184 F.R.D. 49, 54 (S.D.N.Y. 1999); *Moore's Federal Practice* § 26.70[6][c].

The draft documents and handwritten notes and comments prepared by Comdata's attorneys are clearly work product to the extent that they were circulated among only Comdata and its attorneys. However, Comdata's attorney appears to have shared the drafts of the Purchase Agreement, and perhaps even his handwritten notes and comments, with the attorneys representing IPS. He states in his affidavit that "I made these notes and revised and edited the text of the Agreement and the proposed defense agreement in consultation with attorneys for IPS at a time when both Comdata and IPS had a common interest in defending this lawsuit and did so with the intention that these communications remain confidential."

We have determined Comdata's attorneys' disclosure of their work product to the attorneys representing IPS was not a waiver of the confidentiality of the shared documents. These disclosures did not amount to a testimonial use of the documents, and when the disclosures occurred, Comdata

---

[34]*United States v. Henke*, 222 F.3d 633, 642-43 (9th Cir. 2000); *In re Steeg*, 112 F.3d 173, 174 (5th Cir. 1997); *McKinnon v. Smock*, 445 S.E.2d 526, 528 (Ga. 1994); *Ocean Spray Cranberries, Inc. v. Holt Cargo Sys.*, 785 A.2d 955, 958 (N.J. Super. Ct. L. Div. 2000); *Baliva v. State Farm Auto. Ins. Co.*, 713 N.Y.S.2d 376, 377 (App. Div. 2000). However, the decision whether to conduct an in camera review of documents claimed to be work product is discretionary. *United States v. Zolin*, 491 U.S. 554, 572, 109 S. Ct. 2619, 2631 (1989); *In re Colorado v. Martinez*, 970 P.2d 469, 477 (Colo. 1998); *State v. Vinson*, 591 N.E.2d 337, 343 (Ohio Ct. App. 1990). Accordingly, a court does not abuse its discretion by declining to review documents in camera when other evidence is sufficient to provide a basis for the court's decision. *In re George*, 28 S.W.3d 511, 519 n.4 (Tex. 2000); *Enron Oil & Gas Co. v. Flores*, 810 S.W.2d 408, 413 (Tex. App. 1991); *Barry v. USAA*, 989 P.2d 1172, 1176 (Wash. Ct. App. 1999).

[35]Work product protection can be waived. Restatement (Third) of the Law Governing Lawyers § 91. However, unlike the attorney-client privilege, the work product doctrine is not waived by mere disclosure but instead by making a testimonial use of the protected material. *United States v. Nobles*, 422 U.S. 225, 239 n.14, 95 S. Ct. 2160, 2171 n.14 (1975); *Wells v. Liddy*, 2002 U.S. App. LEXIS 3356, at *31; *Federal Election Comm'n v. Christian Coalition*, 178 F.R.D. 61, 76 (E.D. Va. 1998).

and IPS were pursuing a common interest in mounting a joint defense against the claims of the Boyd parties. Accordingly, the common interest privilege attached to their communications and permitted the attorneys for the parties to communicate on matters of common interest without waiving the confidentiality of the communications.

The record contains no evidence that either Comdata or IPS shared the drafts of the Purchase Agreement or their correspondence regarding this agreement with third parties. Neither Comdata nor IPS has undertaken to use these documents as a sword in this litigation. Therefore, there is no basis for concluding that Comdata or its attorneys have waived the work product protection of these documents.

### 4.
### No Heightened Showing of Necessity or Unavailability

Once Comdata established that the requested documents contained opinion work product, the burden shifted back to the Boyd parties to demonstrate that this case involves one of the rare circumstances warranting the discovery of opinion work product. To carry this burden, the Boyd parties were required to make a heightened showing that they have a substantial need for the documents and that they are unable to obtain the same or comparable information through other means without undue hardship. At no point in these proceedings have the Boyd parties explained how these documents are necessary.

The Boyd parties have never satisfactorily explained how the drafts of the Purchase Agreement and the related correspondence between Comdata and IPS are relevant to the subject matter of this litigation. In light of their inability to clear this most basic of hurdles, it is not surprising that they are unable to articulate how these documents will materially assist them in establishing the essential elements of their prima facie case. After all, irrelevant documents are, by definition, not essential to a party's ability to prove its claims or defenses. The work of Comdata's attorneys has not become a central issue in this litigation. Accordingly, the trial court erred by ordering Comdata to produce these documents because the Boyd parties did not carry their burden of establishing that the documents were essential to their case.

### V.

The Boyd parties have failed to demonstrate that they are entitled to discover either the draft joint defense agreement, the drafts of the November 15, 1999 Purchase Agreement, or the correspondence between the attorneys for Comdata and IPS regarding these agreements. Accordingly, the trial court, either by erroneously assessing the evidence or by erroneously applying the correct legal principles, erred by ordering Comdata to provide these documents to the Boyd parties. Therefore, we reverse the April 17, 2000 order compelling Comdata to produce the disputed documents and remand the case to the trial court with directions to enter an order denying the Boyd parties' motion to compel the production of these documents. We tax the costs of this appeal, jointly and severally, to Dudley E. Boyd and the Boyd Revocable Inter-Vivos Trust for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE