IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 5, 2018 Session

## DOUGLAS BENJAMIN GREGG v. ESTATE OF JERRY DEAN CUPIT, ET AL

**Appeal from the Chancery Court for Davidson County**
No. 15-1228-II     William E. Young, Chancellor
_____

### No. M2018-00379-COA-R3-CV
_____

This appeal involves a contract between an aspiring country music artist and a record company owner for promotion of the artist's songs. After the record company owner died, the artist demanded an accounting from the owner's widow and filed this lawsuit alleging that the record company and its owner breached the promotion agreement executed by the parties. The trial court found that the record company owner breached the contract by failing "to adequately promote" the artist's singles and awarded the artist a judgment for $223,069.89. We reverse and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Sawnie Robertson Aldredge, Nashville, Tennessee, for the appellants, Estate of Jerry Dean Cupit, and Janie Michelle Cupit.

Steven Glen Fuller, Madison, Tennessee, for the appellee, Douglas Benjamin Gregg.

## OPINION

### I.   FACTS & PROCEDURAL HISTORY

Douglas Benjamin Gregg was living in the state of Washington and working as an insurance salesman when he became interested in pursuing a career as a country music artist. After researching Nashville recording studios online, he traveled to Nashville in September 2006 to record songs in a studio owned and/or operated by Cupit Records, Inc.

Jerry Cupit, the owner of Cupit Records, was a well-known songwriter and record producer. In February 2007, Cupit Records called Mr. Gregg and offered him a record deal.

Thereafter, Mr. Gregg and Mr. Cupit executed a "Production Agreement" for the preparation and production of an eleven-song CD at a project cost of $50,000 to be paid by Mr. Gregg. On March 7, 2007, Mr. Gregg and Mr. Cupit also executed a one-page "Cupit Music Agreement" containing the following provisions pertinent to this appeal:

1. Cupit Music agrees to sign and nationally promote three (3) singles on said artist under The following conditions:
2. A flat fee of one hundred thousand per single will be charged to promote three singles on said artist. This funding will be used at the soul [sic] discretion of Cupit Music. . . .

. . . .

7. Both parties understand the music business is a speculative business and there are no guarantees. Cupit Music makes no guarantee of any level of success. . . .

The Cupit Music Agreement required Mr. Gregg to pay the first payment of $200,000 at the signing of the contract and the next $100,000 once the album was completed and approved by Cupit Records, in order "to set the promotion of the singles in motion." The Cupit Music Agreement provided that the record label would promote up to three additional singles "at a cost of $100,000 each" if funding was available within thirty days of the release of the third single.

Over the next year, Mr. Gregg traveled back and forth from Washington to Nashville to write songs with Mr. Cupit, participate in singing lessons with him, and record the album. The album was completed approximately two years after the parties signed the contracts, and Mr. Gregg paid $346,080 of the amount owed under the contracts. One single was released in August 2009, another single was released in the latter part of 2011, and a holiday-themed song was released and promoted two years in a row around Christmas.

The parties agree that Mr. Cupit and Cupit Records undertook efforts to promote Mr. Gregg's singles. Mr. Cupit incurred expenses for Mr. Gregg to appear on a television show called "Music & Motors" on the RFD-TV television network, and Mr. Gregg performed on approximately ten to eleven episodes of the show. Cupit Records produced a music video for one of the songs. Mr. Gregg participated in the annual CMA Fan Fair in downtown Nashville, performing at least three years with accompanying musicians provided by Cupit Records. He also performed at the Wild Horse Saloon in Nashville. An employee of Cupit Records who was in charge of radio promotion

traveled to Washington, Oregon, Alabama, and around Tennessee with Mr. Gregg on various radio station tours. Cupit Records employed a publicist who scheduled interviews and wrote articles for Mr. Gregg, which led to him being featured in the "Listen Up" and "Who's New" editorial features in Country Weekly magazine. Cupit Records used digital distribution services to send Mr. Gregg's records out to radio stations. When each of the singles was released, the Cupit Records employee in charge of radio promotion devoted sixteen to twenty weeks to calling radio stations in order to promote each song and ask the contacts at the radio stations to listen to it. Cupit Records also paid three third-party independent promoters to call radio stations to promote Mr. Gregg's singles for periods of sixteen weeks. Cupit Records also recorded a fourth song for Mr. Gregg and sent it to a news network in the hope that it would receive airplay.

Despite these efforts, Mr. Gregg did not reach any level of success in his country music career. According to Mr. Gregg, the radio stations that played his songs were mostly AM stations, internet radio stations, "non-recording" stations, or religious stations, and he only sold twelve CDs. Mr. Gregg was removed from the website for Cupit Records around 2012 or 2013 because his contract had ended. Mr. Gregg and Mr. Cupit maintained a very close friendship throughout this time period and even entered into a real estate venture together. Sadly, however, Mr. Cupit was diagnosed with a serious illness and ultimately died in September 2014.

About a month after Mr. Cupit died, Mr. Gregg called his widow and asked her to review any statements and records maintained by Cupit Records and/or Mr. Cupit dating back to 2007 in order to show him how the $350,000 he paid was spent. Essentially, Mr. Gregg wanted to know whether Cupit Records spent "every dime" of the $350,000 promoting his music or if it was spent on other business or personal expenses or promoting other artists. It was Mr. Gregg's position that all of the $350,000 "had to be spent on me, not on other artists, not on buildings, not on personal vehicles." Mr. Gregg told Mr. Cupit's widow that if any money was spent on other purposes, he wanted her to "just give it back." Shortly thereafter, Mr. Gregg sent a formal letter to Mrs. Cupit recounting their "painful" telephone conversation but demanding to audit the books and bank accounts of Cupit Records in order to determine whether "all $350,000 was spent on my record and promotion." He added, "Whatever amount was not spent then of course I want it back."

The attorney for Mr. Cupit's estate sent a letter to Mr. Gregg detailing various expenses incurred by Mr. Cupit and Cupit Records over the years, but this did not satisfy Mr. Gregg. On October 13, 2015, Mr. Gregg filed this lawsuit against Cupit Records and Mrs. Cupit as executrix of the Estate of Jerry Cupit asserting claims for breach of

contract, fraud, breach of fiduciary duty, and unjust enrichment.[1]

A bench trial was held on October 18, 2017. Mr. Gregg maintained the position that the efforts made by Mr. Cupit to promote his music did not "meet the level of what was agreed upon between the parties" or utilize all of the funds that were paid by Mr. Gregg. The defendants argued that Mr. Cupit charged a "flat fee" for his services, that some of the money paid necessarily included profit, and that not all of the money had to be spent on promotional expenses. The trial judge heard testimony from Mr. Gregg, Mrs. Cupit, the employee of Cupit Records who was in charge of radio promotion, and a former employee of Country Weekly magazine.

Mrs. Cupit testified that she had no idea how to provide the requested accounting to Mr. Gregg after her husband died and that she had searched through her late husband's records to look for relevant documents. Mr. Gregg had never requested an accounting before Mr. Cupit died. Numerous invoices and financial documents were introduced as exhibits at trial.

Mr. Gregg testified that it was his initial understanding that all of the money he paid would be used for promoting his music and that Mr. Cupit would use the money to ultimately "get airplay" for his songs. However, Mr. Gregg testified that he had since researched the music industry and learned that "you can't put a hundred thousand dollars into a single for a new artist" because you would never recoup that money in sales. Mr. Gregg said he now knows that "the actual cost to promote a record for a new artist with no previous recognition is between 5- and $7,000." Mr. Gregg suspected that the $350,000 he paid for three singles and CD production was spent on other artists or building expenses, adding, "they needed my money to cover their expenses."

The employee of Cupit Records who was in charge of radio promotion, Dan Hagar, had 27 years of experience in the music industry and owned his own entertainment company at the time of trial. He explained that in order to promote a single, one must contact radio stations and established contacts in the business and ask them to listen to the record. He explained that radio stations are bombarded with records and that it is illegal for a record company to pay a radio station to play a particular song. Mr. Hagar testified that it was typical in the industry to incur $15,000 in promotional expenses even if the artist had paid $300,000 for promotion. He also opined that $300,000 was a very low price compared to what most artists spend to have their records

---

[1] The complaint also named as defendants another Cupit entity and Mrs. Cupit individually. The trial court granted summary judgment to the related entity and to Mrs. Cupit in her individual capacity. Mr. Gregg abandoned his unjust enrichment claim at the beginning of trial due to the existence of a contract.

promoted.

The trial judge took the matter under advisement and entered a written order on February 14, 2018. First, the trial court analyzed Mr. Gregg's claim for breach of the Production Agreement, which provided for the production of a CD for $50,000. The trial court found that Mr. Gregg was "essentially contend[ing] he overpaid for this CD." The trial court found that it was "not the province of this Court to evaluate the wisdom of a contract entered into at arm's length between two individuals with equal bargaining power." The trial court specifically found that both Mr. Cupit and Mr. Gregg "were competent business persons when these contracts were executed and performed." The court found that Mr. Gregg "received what he bargained for, a CD containing eleven of his songs," and finding no fraud, breach of fiduciary duty, or violation of public policy, the court would not interfere with the parties' contract.

The trial court took a different approach with respect to the claim for breach of the Cupit Music Agreement, which provided that Cupit Music would "nationally promote" three singles on behalf of Mr. Gregg for a "flat fee" of $100,000 per single. Although neither party had discussed the issue in the proceedings thus far, the trial court invoked the implied duty of good faith and fair dealing that applies to all contracts. It found that Mr. Cupit failed to meet that implied duty in this case by failing "to adequately promote nationally" the three singles. The trial court noted that Mr. Cupit was paid $300,000 to promote the singles and that, based on the evidence in the record, he only spent a small portion of those funds for promotion. Specifically, the trial court found that Mr. Cupit spent "at best, approximately $58,484.70" to accomplish the nationwide promotion required under the agreement. The trial court concluded that "the paucity of expenses actually incurred" and the "failure to retain a detailed accounting of the time and expenses incurred in promoting the Plaintiff's singles" resulted in a breach of the implied duty of good faith and fair dealing in conducting a nationwide promotion of Mr. Gregg's singles. "Even assuming a generous allowance of thirty percent for profit and overhead (totaling about $17,545.41)," the trial court added, "the total amount incurred by Mr. Cupit under this agreement was only equal to $76,030.11." The trial court awarded the difference between that sum and $300,000 to Mr. Gregg, awarding him a judgment for $223,069.89. The defendants timely filed a notice of appeal.

## II. ISSUES PRESENTED

On appeal, the defendants argue that the trial court erred in finding that Mr. Cupit breached an implied duty of good faith and fair dealing in the performance of the Cupit Music Agreement. For the following reasons, we reverse the trial court's judgment in favor of Mr. Gregg and remand for further proceedings.

## III. STANDARD OF REVIEW

When reviewing a trial court's findings following a bench trial, this Court reviews the record de novo and presumes that the trial court's findings of fact are correct unless the preponderance of the evidence is otherwise. *Nashville Ford Tractor, Inc. v. Great Am. Ins. Co.*, 194 S.W.3d 415, 424 (Tenn. Ct. App. 2005). We review the trial court's legal conclusions with no presumption of correctness. *Id.*

## IV. DISCUSSION

To resolve the issue on appeal, we begin by returning to the language of the contract itself.

1. Cupit Music agrees to sign and nationally promote three (3) singles on said artist under The following conditions:
2. A flat fee of one hundred thousand per single will be charged to promote three singles on said artist. This funding will be used at the soul [sic] discretion of Cupit Music. . . .

. . . .

7. Both parties understand the music business is a speculative business and there are no guarantees. Cupit Music makes no guarantee of any level of success. . . .

At the outset, we reject Mr. Gregg's insistence that this contract required Mr. Cupit to *spend* all of the $300,000 Mr. Gregg paid on promotional expenses. The contract specifically states that Cupit Music was charging a "flat fee" for its services. A "fee" is defined as "[a] charge or payment for labor or services, esp. professional services." *Black's Law Dictionary* (10th ed. 2014). A "fixed fee" is "[a] flat charge for a service; a charge that does not vary with the amount of time or effort required to complete the service." *Id.* For example, a "fixed" or "flat" legal fee "is intended to compensate the lawyer for *all* work to be done on a matter." *Bd. of Prof'l Responsibility v. Reguli*, 489 S.W.3d 408, 422 (Tenn. 2015). Simply put, a flat fee is an advance fee payment "for all work to be done on a matter, regardless of the time required or the complexity of the assignment." Douglas R. Richmond, *Understanding Retainers and Flat Fees*, 34 J. Legal Prof. 113, 118 (2009). It "embraces all work to be done, whether it be relatively simple and of short duration, or complex and protracted." *In re Mance*, 980 A.2d 1196, 1202 (D.C. 2009); *Iowa Sup. Ct. Attorney Disciplinary Bd. v. Piazza*, 756 N.W.2d 690, 697 (Iowa 2008); *see, e.g.*, *In re Estate of Weisberger*, 224 S.W.3d 154, 164 (Tenn. Ct. App. 2006) (describing a contract as "a flat-fee arrangement" where the amount of work that would be required was unknown at the time the contract was signed).

During trial, Mr. Gregg's original argument that Mr. Cupit should have spent the entire $300,000 on promotional expenses transformed into an argument that he was

6

overcharged in the promotion agreement.  He testified:

> My attitude about this, after research, it's kind of flipped a little bit because – it's not that I'm, you know, reminiscing the fact or lamenting the fact I'll never know what he could have done with $100,000 per single if he had spent it on me.  It's the fact that he couldn't spend a hundred thousand on me.
> In other words, it doesn't cost that much.  The only reason he billed me for it was because he needed the money. . . . You couldn't spend more than 5 or $7,000.  It would just be a waste of money.

He said "you just have to call the math on this because you cannot spend a hundred thousand dollars on a new artist because you could never recoup that if CDs sold."  He later added,

> And that's why, to promote a small artist, as Dan has verified, that is roughly $5,000 a single and that is what I have been claiming.  That's all they would spend on a new artist.  And according to the record, that's all of the receipts they have that they can show they promoted.  It's about $5,000 a single.  That's a fact.

Like his argument about the $50,000 production contract, Mr. Gregg basically argued that he overpaid or got a bad deal with respect to his $300,000 promotion contract.

"Tennessee law recognizes an implied covenant of good faith and fair dealing in every contract."  *Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 661 (Tenn. 2013).  However, "'the common law duty of good faith does not extend beyond the agreed upon terms of the contract and the reasonable contractual expectations of the parties.'"  *Id.* at 666. (quoting *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 687 (Tenn. 1996)).  The implied obligation does not "'create new contractual rights or obligations, nor can it be used to circumvent or alter the specific terms of the parties' agreement.'"  *Id.* (quoting *Lamar Adver. Co. v. By-Pass Partners*, 313 S.W.3d 779, 791 (Tenn. Ct. App. 2009)).  "Performance of a contract according to its terms cannot be characterized as bad faith."  *Wallace*, 938 S.W.2d at 687.

Here, the trial court utilized the implied duty of good faith and fair dealing to create new contractual rights and obligations.  It found that Mr. Cupit breached the implied duty of good faith and fair dealing due to the "paucity" of expenses proved at trial and the "failure to retain a detailed accounting of the time and expenses incurred in promoting the Plaintiff's singles."  However, the contract did not require Mr. Cupit to maintain any type of "detailed accounting" of the time and expenses he incurred in promoting Mr. Gregg's singles.  The issue of accounting was only addressed in a separate

7

contract with respect to CD sales.  At trial, Mr. Gregg was asked whether he was contractually entitled to some type of accounting regarding how his money was spent, and he responded, "only as far as CDs were being sold."  Mr. Cupit had no contractual obligation, express or implied, to maintain a detailed accounting of its promotional expenses.

Furthermore, Mr. Cupit did not breach the implied duty of good faith and fair dealing by charging Mr. Gregg a flat fee of $300,000 for promotion but incurring, as the trial court found, "at best, approximately $58,484.70" in promotional costs.  "'An alleged breach of the duty of good faith and fair dealing must be based on the contracting parties' reasonable expectations and the rights established by their agreement.'"  *Kinard v. Nationstar Mortg. LLC*, No. W2017-01131-COA-R3-CV, 2018 WL 1150076, at *6 (Tenn. Ct. App. Mar. 2, 2018) (quoting *Pugh v. Bank of America*, No. 13-2020, 2013 WL 3349649, at *12 (W.D. Tenn. July 2, 2013)).  Accordingly, whether a party acted in good faith in performing a contract "is measured by the terms of the contract."  *Isaac v. Ctr. For Spine, Joint, & Neuromuscular Rehab., P.C.*, No. M2010-01333-COA-R3-CV, 2011 WL 2176578, at *4 (Tenn. Ct. App. June 1, 2011).

Here, the contract expressly provided that funding would be used at the sole discretion of Cupit Music.  With a sole discretion clause, such discretion "ha[s] to be exercised with good faith."  *Zuzinec v. Barrett*, No. E2006-00054-COA-R3-CV, 2006 WL 2354459, at *6 (Tenn. Ct. App. Aug. 15, 2006); *see also Park Place Ctr. Enterprises, Inc. v. Park Place Mall Assocs., L.P.*, 836 S.W.2d 113, 116-17 (Tenn. Ct. App. 1992).  In the exercise of his discretion, Mr. Cupit sent the records to radio stations and employed in-house and independent record promoters to promote the singles for periods of sixteen to twenty weeks for each single.  Cupit Records produced a music video for Mr. Gregg and also paid for him to appear on at least ten episodes of a television show.  On behalf of Cupit Records, Mr. Hagar took Mr. Gregg on radio station tours across four states and arranged for him to perform at the Wild Horse Saloon and at the annual CMA Fan Fair on several occasions, where Cupit Records provided him with a booth.  The publicist employed by Cupit Records scheduled interviews and wrote articles for Mr. Gregg, and he was featured in Country Weekly magazine more than once.  Cupit Records also recorded another song for Mr. Gregg, at his request, and sent it to a news network in the hope that it would receive airplay.  The record does not support a finding that these actions were unreasonable or in bad faith.  In fact, Mr. Gregg testified that based on his recent research of the music industry, "to promote a small artist . . . is roughly $5,000 a single . . . . That's all they would spend on a new artist.  And according to the record, that's all of the receipts [the defendants] have that they can show they promoted.  It's about $5,000 a single."

Unfortunately, Mr. Gregg was not successful in his country music career, but the contract acknowledged the speculative nature of the music business and stated that Mr.

8

Cupit made "no guarantee of any level of success." Nothing in the contract or the reasonable expectation of the parties would support granting Mr. Gregg a judgment for the portion of the $300,000 flat fee that was not directly traceable to promotion expenses. And, the simple fact that Mr. Gregg claims that he overpaid for promotion does not provide a basis for rewriting the parties' contract to provide for some other "allowance" for profit and overhead.

"It is not the role of the courts, even courts of equity, to rewrite contracts for dissatisfied parties." *Snyder v. First Tennessee Bank, N.A.*, 450 S.W.3d 515, 518 (Tenn. Ct. App. 2014). "'[I]n the absence of mistake or fraud, the courts will not create or rewrite a contract simply because its terms are harsh or because one of the parties was unwise in agreeing to them.'" *Id.* (quoting *Towe Iron Works, Inc. v. Towe*, 243 S.W.3d 562, 569 (Tenn. Ct. App. 2007)). "Courts cannot rescue a contracting party from an agreement that later turns out to be ill-advised." *Lambert v. Lambert*, No. M2013-01885-COA-R3-CV, 2014 WL 3563630, at *8 n.3 (Tenn. Ct. App. July 18, 2014). In the words of our supreme court:

> Contract law in Tennessee plainly reflects the public policy allowing competent parties to strike their own bargains. Steven W. Feldman, *Tennessee Practice: Contract Law & Practice* § 1:6, at 17 (2006). Tennessee's courts are "not at liberty to make a new contract for parties who have spoken for themselves." *Smithart v. John Hancock Mut. Life Ins. Co.*, 167 Tenn. 513, 525, 71 S.W.2d 1059, 1063 (1934). Accordingly, the courts do not concern themselves with the wisdom or folly of a contract, *Chapman Drug Co. v. Chapman*, 207 Tenn. 502, 516, 341 S.W.2d 392, 398 (1960), and will not relieve a party of its contractual obligations simply because the contract later proves to be burdensome or unwise. *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 223 (Tenn. Ct. App. 2002); 28 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 70:209, at 232 (4th ed. 2003) ("Courts are not in the business of rewriting contracts to bail out parties who have failed to prudently construct their business transactions.").

> When the parties have reduced their agreement to writing, the law favors enforcing these contracts as written. *Bob Pearsall Motors, Inc. v. Regal Chrysler–Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975); *Home Beneficial Ass'n v. White*, 180 Tenn. 585, 588, 177 S.W.2d 545, 546 (1944); *Sikora v. Vanderploeg*, 212 S.W.3d 277, 286 (Tenn. Ct. App. 2006). In the absence of fraud, mistake, or other supervening legal reason, the courts should construe unambiguous written contracts as they find them. *Boyd v. Comdata Network, Inc.*, 88 S.W.3d at 223.

*Ellis v. Pauline S. Sprouse Residuary Tr.*, 280 S.W.3d 806, 814 (Tenn. 2009). In this case, the trial court found no indication of fraud and concluded that both Mr. Cupit and Mr. Gregg "were competent business persons when these contracts were executed and performed." If Mr. Gregg did in fact make "a bad bargain," then "'he has no one to blame but himself.'" *Stone v. Stone*, No. M1997-00218-COA-R3-CV, 2000 WL 1679434, at *6 (Tenn. Ct. App. Nov. 9, 2000) (quoting *Pipkin v. Lentz*, 354 S.W.2d 87, 92 (Tenn. Ct. App. 1961)). Or, as country artist Chris Stapleton sings, "I got nobody to blame but me."

## V.   CONCLUSION

Finding no breach of contract, we reverse the trial court's judgment in favor of Mr. Gregg and remand for further proceedings. Costs of this appeal are taxed to the appellee, Douglas Benjamin Gregg, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE